In re William Bollum EBERLE, f/d/b/a Temptations, Debtor.

NISSWA STATE BANK, a corporation, Plaintiff,

v.

William Bollum EBERLE, f/d/b/a Temptations, Defendant.

In re Carolyn Bollum EBERLE, a/k/a Carolyn Effie Eberle and Mrs. William Eberle, f/d/b/a Temptations, Debtor.

NISSWA STATE BANK, a corporation, Plaintiff,

v.

Carolyn Bollum EBERLE, d/b/a Temptations, Defendant.

Bankruptcy Nos. 5-84-111, 5-84-112. Adv. Nos. 5-84-24, 5-84-25.

United States Bankruptcy Court, D. Minnesota, Fifth Division.

Sept. 9, 1985.

Steven A. Hanson, Brainerd, Minn., for plaintiff.

Thomas R. Borden, Brainerd, Minn., for defendants/debtors.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

The above-captioned matters came on for trial before the undersigned United States Bankruptcy Judge on May 16, 1985. Plaintiff appeared by its attorney, Steven A. Hanson. Defendants William Bollum Eberle and Carolyn Bollum Eberle (hereinafter referred to collectively as "Debtors") appeared personally and by their attorney, Thomas R. Borden. Upon the evidence adduced at trial, and all of the other files, records, and proceedings herein, the Court makes the following as its Findings of Fact, Conclusions of Law, and Order for Judgment.

### FINDINGS OF FACT

Debtors are mother and son. From the spring of 1980 until July 1, 1983, they operated a retail store in Nisswa, Minnesota as proprietors under the business name of "Temptations". They dealt in toys, clothing, gifts, and housewares. They filed their Voluntary Petitions under Chapter 7 of the Bankruptcy Code in this Court on April 6, 1984. During the course of their business activity, Plaintiff provided the major source of financing for their operations. Plaintiff was the major creditor scheduled on their Petitions.

Debtors were the sole managers and employees of their business from April, 1980 through February, 1983, when Debtor William Eberle withdrew from active involvement in the business. From February, 1983, through July 1, 1983, Debtor Carolyn Eberle exercised sole control over the conduct of the business, though she had several short-term part-time employees assisting her.

Debtors initially invested approximately $25,000.00 to $30,000.00 of Debtor William Eberle's funds in their business, the proceeds of bank stock which Debtor William Eberle had inherited from his father. Debtors had known James Whiting, Plaintiff's Board Chairman and principal shareholder, as a family friend for over ten years. Craig Whiting, James Whiting's son, was a personal friend of Debtor William Eberle and visited Debtors at their store several times per week from 1980 through 1983. On April 4, 1980, Debtors obtained their first loan from Plaintiff in the amount of $7,000.00. They took out this loan to purchase inventory and to pay other startup expenses. Periodically over the next two and one-half years Debtors obtained additional credit from Plaintiff. During the early months of their business operation they obtained several cash advances by granting Plaintiff a security interest in two Certificates of Deposit of a total face value of $15,000.00. With Debtors' consent, Plaintiff applied this security to the debt on July 24, 1980. This consensual offset was the sole major principal

payment which Debtors made to Plaintiff at any point during their three-year financial relationship; at no time did Debtors ever make a principal payment to Plaintiff from funds which they had generated from their business.

On November 20, 1980, Debtors established a line of credit with Plaintiff to enable them to purchase additional inventory, furniture and fixtures. Debtors granted Plaintiff a security interest in "inventory now owned or hereafter acquired", which was duly perfected on December 22, 1980. On June 11, 1981, Plaintiff made an additional $20,000.00 loan to Debtor William Eberle for startup costs on "Gourmet Unlimited", a new business which Eberle and a partner were establishing in the Minneapolis-St. Paul area. James Whiting was involved in these transactions and others through October, 1982, and assisted Debtors in completing forms for the loans.

Debtors continued to request additional credit from Plaintiff, but Plaintiff granted them increasingly smaller cash advances. After March, 1981, their transactions were limited to renewals of earlier notes and their accrued interest, plus minor additional advances which usually did not exceed $1,000.00. As the months wore on without a substantial payment by Debtors on the several loans, Plaintiff's then-President David Jones became concerned about Plaintiff's exposure. In early October, 1981, he requested Debtor William Eberle to submit a personal financial statement as a precondition to any continuing extension or refinance of credit. Debtor William Eberle had never filled out a personal financial statement. Mr. Jones closely assisted him in filling out Plaintiff's standard form, suggesting that assets be valued at their "replacement cost" and completing entries and column totals in his own handwriting. Debtor Carolyn Eberle neither participated in the preparation of this statement, nor did she sign it.

Mr. Jones left the employ of the Bank at some point in early 1982. In the summer of 1982, Michael R. Ginter, Plaintiff's new President, contacted Debtors to try to come to terms with them on the overdue status of their accounts. Mr. Ginter recognized that the value of Debtor's inventory was only a fraction of the balance on the debt, and that Plaintiff was seriously undersecured. During the course of several conversations with Mr. Ginter, Mr. Whiting, and others in the summer and fall of 1982, Debtors were advised that Plaintiff wished to "restructure the loans", to take additional security for the existing obligations (preferably in the form of a second mortgage against the substantial homestead equity shown on the 1981 financial statement), and to work out some sort of repayment plan involving either an immediate liquidation of the business assets or regular payments from continuing business income. Throughout the fall, winter and spring of 1982–83, Mr. Ginter and Mr. Whiting continued to try to convince Debtors to grant Plaintiff a second mortgage on their homestead. Debtors refused to do so on advice of their then-counsel.

By late October, 1982, the total of Debtors' several obligations to Plaintiff was approximately $83,000.00, including accumulated interest. The business of Gourmet Unlimited had failed and that note was delinquent. The various Temptations obligations were seriously overdue. On or about November 2, 1982, Debtor William Eberle gave a second personal financial statement to Plaintiff; he was again assisted by one of Plaintiff's employees in filling out the statement. Both Debtors signed this statement, though Debtor Carolyn Eberle did not participate in the preparation of it. The bulk of corresponding entries for assets and liabilities scheduled in the two financial statements were identical. A summary of those line entries in which there were differences is as follows:

| ASSETS | Statement of 10/15/81 | Statement of 11/2/82 |
|---|---|---|
| Cash in other banks | $ 1,000.00 | $750.00 |
| Homestead | 120,000.00 | 130,000.00 |
| Inventory and fixtures | 35,700.00 | VALUE LEFT BLANK |
| Marine equipment | 11,200.00 | 11,000.00 |
| Gourmet Unlimited | 39,000.00 | VALUE LEFT BLANK |
| Personal property | 50,000.00 | VALUE LEFT BLANK |
| **LIABILITIES** | | |
| Notes payable to Plaintiff | $ 33,000.00 | $83,000.00 |
| Homestead mortgage | 9,800.00 | 8,500.00 |

As summarized by Plaintiff's employees on the two financial statements, Debtor William Eberle's net worth dropped from $229,300.00 to $63,042.00 between the granting of the two financial statements.[1]

Mr. Ginter submitted the second financial statement to Mr. Whiting. There is absolutely no evidence of record that Mr. Whiting relied in any way on the financial statement. Rather, it seems that, as an old family friend of Debtors, Mr. Whiting decided to refrain from "calling in" all of Debtors' obligations, and to consolidate of all of their obligations into one $83,000.00 note. He took his decision to Plaintiff's Board of Directors in November, 1982. While the Board may have discussed the transaction perfunctorily, it is apparent that it no more than "rubber-stamped" Mr. Whiting's decision. There is no convincing evidence of record that the Board relied in any way on the 1982 financial statement.

On November 19, 1982, both Debtors executed a final promissory note in favor of Plaintiff in the sum of $83,000.00. This note was secured by Debtors' inventory, fixtures and furnishings. Plaintiff filed a financing statement in the office of the Crow Wing County Recorder on December 8, 1982.

When Debtors executed the November 19, 1982 note, they did so with the intention, however deluded, of ultimately repaying Plaintiff. Though they were never able to conceive a concrete repayment plan with actual projections, they intended to pay Plaintiff as they were able, in some unknown amount, from the proceeds of sales of inventory; from Debtor William Eberle's wages from the outside employment which he then realized he had to find; and from the anticipated proceeds of a lawsuit which Debtor William Eberle had commenced against his ex-partner in Gourmet Unlimited in Hennepin County District Court.

At the beginning of 1983, Debtors' profit and loss statement which they prepared for Plaintiff alleged that they had store inventory of $20,668.00, taken at cost. In February, 1983 Debtors finally realized that Temptations could not generate sufficient income for them to continue to draw a salary to meet their own needs. As a result, Debtor William Eberle took employment with R.J. Reynolds Tobacco Company and Debtor Carolyn Eberle assumed sole responsibility for the store. During the

---

1. The majority of the alleged drop in net worth is attributable to four major differences: 1. The line entry for "Personal Property" (for which *no* trial witness was able to explain either the nature of the property as originally scheduled or its apparent non-existence a year later); 2. The deletion of any value for the failed Gourmet Unlimited business in the 1983 statement (though it should be noted that the 1981 entry neglected to offset the value of the Bank's debt against the value of that business); 3. The unexplained absence of a value entry in the 1982 statement for the Temptations inventory and equipment; and, 4. The great increase in scheduled debt to Plaintiff between the two statements (at least partly explained by a more thorough listing of individual debts on the 1982 statement). No employee of Plaintiff ever inquired further as to these discrepancies, in spite of their apparent magnitude.

spring of 1983, Debtor Carolyn Eberle continued to operate the store and sell existing inventory. There is no precise evidence of record to establish the volume of sales during this period. It appears that the dollar value of sales was relatively meager; that almost all of the cash receipts were applied to pay rent, utilities, and other store expenses; and that Debtors did not draw any more than a total of several hundred dollars out of cash receipts from February, 1983 through July 1, 1983, for themselves.

During these months, the unusual forebearance and cordiality which had previously characterized the relationship between Debtors and Plaintiff vanished. As Mr. Ginter personally observed from his office across the street from Temptations, Debtors continued to sell store inventory. Debtors actively refused to grant Plaintiff any more security for its debt than it already held. Plaintiff's employees continued their efforts to cajole Debtors into granting a second homestead mortgage, but made no effort to realize on Plaintiff's existing security until June, 1983. Debtors made no deposits to their business bank accounts with Plaintiff for the months of January through July, 1983.

In June, 1983 Plaintiff commenced a replevin action in Crow Wing County District Court, seeking to repossess the Temptations inventory, fixture and equipment. Under a stipulation entered by Plaintiff and Debtors on July 1, 1983, (subsequently reduced to writing in early September, 1983), Debtors agreed that Plaintiffs could take possession of the store inventory and liquidate the same to apply the proceeds to its debt. Debtors vacated the Temptations premises on July 1, 1983. Plaintiff's employees or agents conducted a thorough inventory of its remaining inventory within twenty-four hours and arrived at a total retail value of $16,044.47. Utilizing a "bench mark-up" of 50%, Plaintiff arrived at a "cost basis" of $8,022.00 for the inventory. Plaintiff's liquidation sale of the inventory resulted in net proceeds of approximately $5,500.00. Plaintiff has received no payment on its debt since application of the liquidation proceeds to it. Its present outstanding debt is approximately $78,000.00.

## CONCLUSIONS OF LAW

Plaintiff seeks to have Debtors' debt to it found nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(6), which provide in pertinent part as follows:

(a) A discharge under section 727 .. of this title does not discharge an individual debtor from any debt—

\*　　\*　　\*　　\*　　\*　　\*

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) That the debtor caused to be made or published with intent to deceive; ...

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity ...

To prevail on a challenge to dischargeability on any of these three grounds, a petitioning creditor must prove all elements of the grounds by clear and convincing evidence, a burden of proof more stringent that the standard burden in civil cases of a preponderous of the evidence. *In Re Pommerer*, 10 B.R. 935, 938 (Bankr.D.Minn.1981) (fraud); *In Re Johnson*, 40 B.R. 756, 758 (Bankr.D.Minn.1984) (fraud); *In Re Barnacle*, 44 B.R. 50, 53 (Bankr.D.Minn.1984) (fraud); *In Re Harms*, 53 B.R. 134, 139–40 (Bankr.D. Minn.1985) (false financial statement); *In Re Egan*, 52 B.R. 501, 506 (Bankr.D.Minn. 1985) (willful and malicious injury). *See, in*

*general, In Re Huff,* 1 B.R. 354 (Bankr.D. Utah 1979). The Court will treat each of the three grounds individually.

### § 523(a)(2)(A): FALSE PRETENSES, FALSE REPRESENTATION, OR ACTUAL FRAUD.

The elements which must be proven to establish nondischargeability under § 523(a)(2)(A) have been generally recognized in this District as follows:

1. The obtaining of money, property, services, or an extension, renewal, or refinance of credit by a debtor,

2. Using a false representation pertaining to a past or present fact,

3. With knowledge of the representation's falsity, or its assertion as fact with reckless disregard for its truth or falsity,

4. And an intention to deceive the other party or to induce the other party to act upon the representation,

5. Reasonable reliance by the creditor upon the misrepresentation, and

6. Resultant damage to the creditor.

*In Re Pommerer* at 939; *In Re Johnson* at 758.

█ Plaintiff's trial brief and trial arguments did not segregate the three legal bases for its cause of action as clearly as may be desired, and the Court is at first at a loss to determine the applicability of § 523(a)(2)(A) to this proceeding.[2] Plainly, the alleged use of a false written financial statement to obtain the final renewal of Debtors' obligations must be analyzed under § 523(a)(2)(B). Similarly, analytical precision demands that Debtors' alleged diversion of proceeds of Plaintiff's collateral be analyzed as a willful and malicious conversion of security, not as a debt incurred by fraud. The only colorable applicability of § 523(a)(2)(A) to the facts is Plaintiff's

argument that Debtors' actions and statements prior to executing the November 19, 1982 note were a fraudulent representation that they intended to pay their obligations to Plaintiff. Initially, the Court concludes that the transaction of November 19, 1982, constituted the "obtaining of ... [a] renewal ... or refinance of credit". This is so even though Debtors received no new value in the transaction; Plaintiff's forebearance from exercising its rights and affirmative entry into a consolidating note constituted a "renewal" or "refinance" within the meaning of § 523(a)(2)(A). 3 COLLIER ON BANKR. ¶ 523.10 at 523–71 (15th ed. 1984); *In Re Bacon,* 13 B.R. 559 (Bankr.D. Vt.1981); *In Re Carter,* 11 B.R. 992 (Bankr.M.D.Tenn.1981). *See also, In Re Garman,* 643 F.2d 1252 (7th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981) (Act case) (assuming this conclusion without discussion). *Contra, In Re Gadberry,* 37 B.R. 752 (Bankr.C.D.Ill.1984). In addition, it is undisputed that this transaction resulted in detriment to Plaintiff.

█ This leaves four remaining elements, the first three of which basically require a conclusion that Debtors knowingly and fraudulently made a false statement of their intent and ability to meet their obligations to Plaintiff to induce the refinancing of the earlier notes. It is true that Debtors' testimony regarding their good-faith intent to repay the massive debt seems self-serving at present, given their prior inability to generate store income sufficient to service the debt. In retrospect, Debtor William Eberle's profession of intent to make meaningful payments from wages from employment which he had then neither obtained nor even applied for seems similarly fatuous. Debtors' testimony on

---

**2.** Plaintiff's trial brief contains no citation to any authority more recent than a 1973 case applying the Bankruptcy Act, and mistakenly cites a number of Act cases relating to revocation or denial of discharge, rather than dischargeability of a particular debt. Plaintiff's counsel's failure to cite any case law decided after the enactment of the Bankruptcy Code in 1978 is curious, particularly in view of the pervasive revision of bankruptcy law which took place with the enactment of the Code, and the ensuing extensive development of case law by the Bankruptcy Courts. This Court follows the general rule that case law decided under the Bankruptcy Act is automatically suspect authority unless legislative history and the similarity of statutory language strongly indicate that cases decided under the Act are still good law.

this issue is the only evidence of record, however, and Plaintiff did not even challenge it by extended cross-examination at trial. It is true that direct proof of fraudulent intent is usually lacking; the Court recognizes that intent and knowledge of falsity must generally be proven by a pattern of circumstantial evidence. *In Re Barnacle* at 55. The record in this proceeding, however, requires the Court to conclude that Debtors' estimation of their ability to make meaningful payments to Plaintiff and their intention to do so was not fraudulent, even if it appears to have been based on less than a full acknowledgment of the straitened nature of their circumstances. Plaintiff simply did not prove the existence of a fraudulent intent not to follow through contemporaneous with the refinancing. *In Re Schwartz*, 45 B.R. 354, 357 (Bankr.S.D.N.Y.1985).

■ Equally prominent by its absence is proof of reasonable reliance by Plaintiff on Debtors' professions of intent to repay the loan.[3] Plaintiff presented no testimony that its employees relied on Debtors' explicit or implicit representations of their intent and/or ability to repay the loan in deciding to renew and refinance Debtors' obligations. As discussed *infra* at p. 647, the Court concludes that Plaintiff (in the person of Mr. Whiting) relied on factors other than Debtors' representations and written financial statements in "rolling over" its debt.

The only other false representation on which Plaintiff equally relies is Debtors' alleged promise to grant a second homestead mortgage to secure the debt. Debtors convincingly testified they never made such a promise; Plaintiff elicited no evidence to the contrary. In any event, even though Plaintiff's employees hoped to obtain the second mortgage, there is no evidence that Plaintiff relied in any way on such a promise in deciding to refinance the debt.

The Court therefore concludes that Plaintiff has failed to show the existence of the

elements of § 523(a)(2)(A) by clear and convincing evidence and, therefore Debtors' debt to Plaintiff is not nondischargeable under that subsection.

### § 523(a)(2)(B): FALSE FINANCIAL STATEMENT

■ As with the other causes of action for nondischargeability, the burden of proving all six elements of § 523(a)(2)(B) is entirely on the party seeking to have a debt found nondischargeable. *In Re Klein*, 20 B.R. 119, 121 (Bankr.E.D.Pa.1982). A "materially false" statement is one "which paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit". *In Re Denenberg*, 37 B.R. 267, 271 (Bankr.D. Mass.1983). A written financial statement setting forth a debtor's assets, liabilities, and net worth is by its very nature a written statement which "respect[s] the debtor's ... financial condition". *In Re Harms*, At 140.

Of all of the elements of § 523(a)(2)(B), the Courts have probably devoted most attention to the requirement of reasonable reliance. *See, generally,* discussion in *In Re Harms*, At 140–41. As under § 523(a)(2)(A), direct proof of fraudulent intent is rarely forthcoming, and the Court is usually left with a pattern of circumstantial evidence from which it may or may not infer intent. *In Re Brown*, 32 B.R. 554, 557 (Bankr.E.D.Tenn.1983). This Court has previously adopted a standard allowing it but not requiring it to make an inference of fraudulent intent, once a petitioning creditor has demonstrated the existence of the first four elements under § 523(a)(2)(B) and has produced some proof of the debtor's actual knowledge of falsity or reckless disregard for the truth or falsity of his financial statement. *In Re Harms*, At 141.

Plaintiff's argument applying § 523(a)(2)(B) is again not a model of clarity. Plaintiff's broad conclusory assertions of the falsity of Debtors' financial state-

---

**3.** Some Courts have recognized this element as something in the nature of a proximate cause

requirement. *In Re Preston,* 47 B.R. 354, 357 (E.D.Va.1983).

ments do not illuminate the matter. The record must therefore be examined to determine whether all of the elements of § 523(a)(2)(B) have been established.

Again, there is no question that the threshold element of a "renewal ... or refinance of credit" has been proven. Plaintiff has also shown the basic element of use of a written statement respecting Debtors' financial condition.

■ The record, however, does not support a finding that any entry in either financial statement was false. Plaintiff's cross-examination of Debtor William Eberle revealed that there was at relevant times some ambiguity over the status of title to Debtors' homestead, and cast doubt on whether Debtor William Eberle in fact held any record title to it. Plaintiff's evidentiary development was inconclusive, however. The record more readily supports a conclusion that at the relevant times, Debtor William Eberle held a remainder interest subject to his mother's life estate, or an interest as devisee under his father's unprobated Will, than a conclusion that he held no interest at all. Regardless, Plaintiff's narrative account records reveal that its employees were aware of the uncertain status of title as early as September 19, 1982. In addition, both Debtors signed the 1982 financial statement as a statement of financial condition for both of them. Given that no qualification on the title issue was either requested or given, the statement could reasonably be taken as an assertion that one, the other, or both of them held the homestead as an asset. Plaintiff elicited no evidence that any of the other entries on either financial statement was false.

■ On the element of reasonable reliance, the record is completely devoid of convincing evidence that Plaintiff relied upon Debtors' 1982 financial statement. Both Debtor William Eberle's testimony and Debtors' cross-examination of Mr. Gin-

ter lead the Court to conclude that James Whiting, as Plaintiff's primary shareholder and Board chairman, was the only person actively deciding to renew and refinance Debtors' various obligations in November, 1982. The Court concludes that Mr. Whiting relied on his long-standing friendship with Debtors' family, and on the possibility (however illusory) that Debtors would grant the Bank additional security, in forebearing from exercising Plaintiff's rights against Debtors and its security in November, 1982, and in deciding to then renew and refinance Debtors' obligations. It appears that Mr. Whiting's presentation to Plaintiff's directors was a mere formality at best.[4]

■ In any event, even had reliance been proven, the Court would be constrained to find that Plaintiff's reliance was unreasonable. Comparison of the two financial statements reveals that values were left off the entries for a number of specific categories of property in Debtors' schedule of assets in the 1982 financial statement, even though the categories themselves are brought to Plaintiff's attention by handwritten notations. No attempt is made in the financial statement to account for the absence of a value for these assets, and their absence drastically changed Debtors' scheduled net worth. Reliance on a financial statement has been found to be unreasonable where the form inquiries on a statement are so limited as to simply not provide a clear and comprehensive picture of a debtor's finances. *In Re Magnusson,* 14 B.R. 662 (Bankr.N.D.N.Y. 1981); *In Re Andrews,* 33 B.R. 970 (Bankr. D.Mass.1981); *In Re Bonefas,* 41 B.R. 74 (Bankr.N.D.Iowa 1984). By the same reasoning, reliance on a financial statement can be found unreasonable where a debtor has failed to fill in its line entries to an extent where it simply does not give a complete summary of his financial condition. In this case, the financial statement bristled with "red flags" placing Plaintiff

---

**4.** Plaintiff's failure to call Mr. Whiting for testimony was puzzling, as his testimony would have shed much light on these issues. No inference may be drawn from Mr. Whiting's absence at trial, though the logical conclusions of speculation on Mr. Whiting's absence are only unfavorable to Plaintiff.

on notice that the financial statement might be incomplete or that Debtors' financial condition had materially changed and further inquiry was merited; the conspicuous blanks created an obvious discontinuity with the earlier statement. *See, e.g., In Re Harms,* At 143–44; *In Re Breen,* 13 B.R. 965, 969 (Bankr.S.D.Ohio 1981); *In Re Smith,* 2 B.R. 276 (Bankr.E.D.Va.1980). Having failed to investigate the obvious discrepancies between the two statements, Plaintiff cannot be held to have *reasonably* relied on the 1982 statement. *In Re Furimsky,* 41 B.R. 724, 728–29 (Bankr.D.Ariz. 1984).

█ Lastly, Plaintiff has failed to prove that Debtors submitted the November, 1982 financial statement with the requisite intent to deceive. Even given that intent to deceive may be proven by circumstantial evidence, Plaintiff completely failed to produce circumstantial evidence establishing anything more than a deteriorating financial situation, an untenable business relationship, and, most likely, growing desperation on the part of both Plaintiff and Debtors. Plaintiff failed to elicit evidence that any of the asset values in the financial statement were false, or that Debtors omitted or misstated any material number or amount of debts.

Thus, Plaintiff has failed to prove up all of the elements of § 523(a)(2)(B) by clear and convincing evidence. It has not shown that either statement was materially false. Its actions in refinancing the debt appear to have been motivated more by the Whiting-Eberle personal ties and the possibility of a future accommodation, rather than any hard-headed determination that Debtors possessed adequate resources to afford recourse to Plaintiff in the event of default. Lastly, Plaintiff failed to produce any convincing evidence of intent to defraud on Debtors' part. As a result, Debtors' debt to Plaintiff is not nondischargeable under § 523(a)(2)(B).

### § 523(a)(6): WILLFUL AND MALICIOUS INJURY TO PROPERTY

█ Though § 523(a)(6) does not expressly so state, "willful and malicious injury" can include a willful and malicious conversion of security. S.REP. No. 989, 95th Cong., 2nd Sess. at 79 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; *In Re Pommerer* at 940; *In Re Egan* at 505–06. A finding of conversion requires a finding that a debtor wrongfully assumed dominion over personal property to the exclusion of possession and control by the owner, and in repudiation of the owner's rights. *In Re Pommerer* at 940. To prevail under § 523(a)(6), a petitioning creditor must show that the debtor inflicted injury both willfully and maliciously. *In Re Thomas,* 36 B.R. 851, 853–4 (Bankr.W.D.Ky.1984), and cases cited therein. "Willfulness" is established by proof that a debtor intentionally performed the basic action of which the Plaintiff complains. *In Re Egan* at 506. In proceedings involving alleged conversion of secured collateral, "malice" is shown by proof that a debtor disposed of security with the specific knowledge that the disposition would invariably and indubitably cause harm to the secured creditor *or* by proof that the debtor had the specific intention of causing harm to the secured creditor by the disposition. A debtor's sale or other disposition of secured property is not an act which invariably implies malice toward the secured party. *Davis v. Aetna Acceptance Corp.,* 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *In Re Hinckle,* 9 B.R. 283 (Bankr.D.Md.1981). Rather, this is a factual determination which can be made only on a case-by-case basis. *In Re Pommerer* at 940; *In Re Egan* at 507–08. A showing that the debtor knew the secured creditor had specific rights to its security and the proceeds thereof and deliberately disregarded those rights is sufficient. *In Re Pommerer* at 941; *In Re Egan* at 507–08. However, where a debtor sells secured collateral with the awareness, knowledge and apparent acquiescence of the secured party, at a time when the secured party could have exercised its security interest, a conversion has not taken place. *Bennet v. W.T. Grant Co.,* 481 F.2d 664 (4th Cir.1973).

In the instant case, there is no question that Debtors sold some substantial amount of Plaintiff's collateral, and continued to do so during the time when their debtor-creditor relationship soured. There is also no question that Debtors did not apply any of the proceeds of the sales to their debt to Plaintiff. However, there is no evidence suggesting that sales prior to the November 2, 1982 renewal were made other than in the ordinary course of Debtors' retail business activity, or without Plaintiff's consent. This is not a case where a security agreement specifically prohibited sales of collateral without notice of each sale to the secured creditor as in *In Re Fields*, 44 B.R. 322 (Bankr.S.D.Fla. 1984). In addition, Mr. Ginter baldly admitted that he personally observed continuing sales of Plaintiff's collateral for a period of at least six months, during the final throes of Debtors' business activity and Plaintiff's and Debtors' business relationship—and took no steps whatsoever to halt the process. By the late winter and early spring of 1983, it was obvious to all parties that Debtors' business could not be saved. Only one inference can be drawn from Plaintiff's forebearance during this time: as it was still attempting to inveigle Debtors into granting it a second homestead mortgage, its employees consciously forebore from taking recourse against its existing security to avoid destroying any remaining good graces which it enjoyed with Debtors. Having apparently made this conscious strategy decision (and, unfortunately, lost), Plaintiff cannot now be heard to complain that Debtors converted its security. There is no conversion giving rise to a nondischargeable debt where an owner or interest-holder has acquiesced to the acts allegedly constituting the conversion.

### CONCLUSION

Because Plaintiff has failed to prove by clear and convincing evidence the existence of any of the grounds for nondischargeability under §§ 523(a)(2) and 523(a)(6), it follows that the Court cannot find that Debtors' debt or any portion of it are nondischargeable in bankruptcy.

### ORDER FOR JUDGMENT

Based upon the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Debtors' debt to Plaintiff was not excepted from the discharge in bankruptcy granted to Debtors on August 21, 1984.