In re James Phillip ADELMAN and Elizabeth (Betty) Agnes Adelman, Debtors.

Robert GOODNOW, Plaintiff,

v.

James ADELMAN, Defendant.

Bankruptcy No. 185–00243.
Adv. No. 87–1002.

United States Bankruptcy Court, D. South Dakota.

Sept. 13, 1988.

Gary E. Davis, Johnson, Eklund and Davis, Gregory, S.D., for plaintiff.

Max A. Gors, Gors, Braun and Zastrow, P.C., Pierre, S.D., for defendant.

## MEMORANDUM DECISION

PEDER K. ECKER, Bankruptcy Judge.

### INTRODUCTION AND PROCEDURAL HISTORY

This matter is before the Court on Robert Goodnow's complaint to determine the dischargeability of a debt owed to him by debtor James Adelman. The complaint states a cause of action based on 11 U.S.C. § 523(a)(2)(A). A trial in the matter was held on October 14, 1987, in Aberdeen, South Dakota. At the conclusion of Goodnow's case, this Court granted Adelman's motion to dismiss the complaint.

On October 30, 1987, this Court, on its own volition, reconsidered its oral order of October 14, 1987. By letter, the Court directed a judgment for plaintiff Goodnow. Defendant Adelman then moved to reconsider and this motion was granted. A new trial was set for April 22, 1988, but Goodnow's counsel was unable to attend the trial due to inclement weather. The Court allowed counsel to complete Adelman's case by deposition testimony and submit simultaneous written arguments by May 23, 1988.

At this time, the Court will decide this nondischargeability matter. It has received the requested argument from Adel-

man. Goodnow, however, has not submitted his argument, despite several requests from the Court. Therefore, the Court assumes that Goodnow and his counsel desire the Court to proceed to a final determination of the case. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## REQUESTS FOR ADMISSION

Adelman filed and served on Goodnow thirty-one requests for admission in March. None of the requests for admission were answered or objected to by Goodnow. In order to proceed with the substantive issues in the case, the Court first must determine whether these requests for admission should be given conclusive effect in this case.

■ Rule 36(a) of the Federal Rules of Civil Procedure states that:

A party may serve upon any other party a written request for the admission, for purposes of the pending action only, of the truth of any matters within the scope of Rule 26(b) set forth in the request that relate to statements or opinions of fact or of the application of law to fact, including the genuineness of any documents described in the request....

:... The matter is admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter,....

Fed.R.Civ.P. 36(a). "Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." Fed.R.Civ.P. 36(b). More simply, if the opposing party does not answer the requests for admission, the general rule is that the court must deem the requests for admission "admitted," or commit reversible error. *See Rainbolt v. Johnson*, 669 F.2d 767, 768 (D.C.Cir.1981). Nonetheless, if the nonanswering party moves to file the answers out of time, and the court determines that the opposing party will not be

prejudiced thereby, the court may permit the filing of answers that would otherwise be untimely. *See Gutting v. Falstaff Brewing Corp.*, 710 F.2d 1309, 1312–13 (8th Cir.1983).

■ The scope of permissible requests for admission is quite broad. The statute expressly permits requests relating to statements or opinions of fact, and the application of law to fact. The requests may encompass "ultimate facts" which establish the plaintiff's cause of action or the defendant's defense. *Campbell v. Spectrum Automation Co.*, 601 F.2d 246, 253 (6th Cir.1979); *City of Rome v. United States*, 450 F.Supp. 378, 383 (D.D.C.1978); *cf.* Fed.R.Civ.P. 36(a) ("A party who considers that a matter of which an admission has been requested presents a genuine issue for trial may not, on that ground alone, object to the request...."). Therefore, a request for admission may be deemed "admitted" even if the facts derived therefrom are dispositive of the case. *See Luick v. Graybar Electric Co., Inc.*, 473 F.2d 1360, 1361–62 (8th Cir.1973); *Williams v. Krieger*, 61 F.R.D. 142, 144 (S.D.N.Y.1973).

■ On the other hand, Rule 36(a) does not allow requests for admission of propositions of law. *Williams v. Krieger*, 61 F.R.D. at 144; *see also* 4A J. Moore, J. Lucas & D. Epstein, *Moore's Federal Practice* ¶ 36.04[4] at 36–33 (2d ed. 1984). If a request for admission is improper and not within the scope permitted by Rule 36(a), then the request should be stricken, even if the opposing party has failed to object. *See Williams v. Krieger*, 61 F.R.D. at 144. Therefore, a request for admission of a proposition of law should be stricken and should not be deemed "admitted."

■ In the present case, Goodnow has not moved the Court for permission to file untimely answers. Thus, there is no need to consider any exception to the general rule that unanswered requests are deemed admitted.

■ The Court concludes that all Adelman's requests for admission are "admitted," with the exception of one. Number 30 of the requests states: "Admit that a

creditor is obligated to prepare and file documents securing himself if he wants to protect himself and it is not the debtor's obligation." This is a statement of law and is improper material for a request for admission. Thus, Number 30 of Adelman's requests for admission will be stricken, and will not be admitted.

## FACTS

The following recitation of the facts is based on the deposition testimony of Robert Goodnow, the plaintiff, Terrence Gere, a bank employee of Norwest (Minnwest) Bank of Ortonville, Minnesota, and David McLaughlin, a Minnesota attorney representing James Adelman. No deposition of the defendant, James Adelman, was ever filed with the Court. In addition, the Court has examined the defendant's interrogatories to the plaintiff, and the plaintiff's answers to those interrogatories, and the defendant's affidavit attached to his earlier motion for summary judgment. The facts set forth in the requests for admission, except for Number 30, are treated as conclusively established. *See* Fed.R.Civ.P. 36(b).

Prior to 1984, plaintiff Goodnow owned a hog equipment business, Upper Midwest Agri–Products, Inc. The business was located on Goodnow's farm, near Armour, South Dakota. In March, 1984, he sold the corporate structure and stock to Larry Koch, and the inventory to Adelman. Adelman and Goodnow orally agreed that Adelman would pay Goodnow $65,000 for the inventory by May 1, 1984. Koch planned to run the business and Adelman would finance it. Koch and Adelman then moved the business to Mitchell.

In May, 1984, Adelman was unable to pay Goodnow. Adelman had purchased another business in Sioux Falls and was overextended. But he continued to pay Goodnow interest each month, while assuring Goodnow that he soon would pay him the entire amount due.

In early 1985, Goodnow's bank was pressing him to take some kind of action on the debt and he was getting nervous about not getting paid. Goodnow told Adelman that he, Goodnow, wanted to be secured on the debt. In April, 1985, Adelman told Goodnow that he had filed a "UCC" (financing statement) to secure Goodnow on the hog equipment inventory at the Mitchell store. After telling Goodnow over the telephone that he had filed the financing statement, Adelman wrote Goodnow that he was "filing a UCC form" on Goodnow's behalf so that Goodnow would be officially a secured creditor. In the same letter, Adelman told Goodnow that he wanted Goodnow in "No. 1 position."

In the meantime, Adelman had borrowed from Norwest Bank of Ortonville, Minnesota (now MinnWest), to finance the purchase of two stores. On March 30, 1984, Norwest loaned him $100,000 for the purchase and start-up of Upper Midwest Agri-Products. An additional $25,000 was loaned on April 4. The bank took a blanket security interest in all of Adelman's inventory, equipment, farm products, consumer goods, general intangibles, and accounts receivable. It perfected its security interest by filing its first financing statement on April 11, 1984.

In June, 1984, Adelman borrowed $46,500 from the bank to purchase Falls Livestock Equipment Center, and gave the bank another blanket security interest in inventory, equipment, farm products, consumer goods, accounts receivable, and general intangibles. According to Exhibit 12 from bank officer Gere's deposition, Adelman borrowed additional sums from Norwest in September, 1984. The bank also required Adelman to take blanket security interests in Upper Midwest Agri–Products, Falls Livestock Equipment, and Plains Agri–Sales (of Aberdeen), Adelman's agricultural equipment businesses. Goodnow has admitted the validity and proper perfection of the various security interests of Norwest Bank in all Adelman's personal property.

By April, 1985, the outstanding balance of Adelman's loans from Norwest was $252,000 and his personal property was fully encumbered by Norwest Bank. All Adelman's farm real estate was mortgaged to Tri–County State Bank. It appears that

the only unencumbered real property was Adelman's homestead.

On December 19, 1985, Adelman filed bankruptcy. The proof of claim filed by Norwest Bank reveals that Adelman owed the bank $312,396.19 on that date. Bank officer Gere testified that the bank recovered approximately $143,444.11 from a liquidation of its security in all of Adelman's businesses. At the time of Gere's deposition in April, 1988, there were approximately $5,500–$7,000 of assets that might still be recovered and a contingent liability of $50,000 that might be eliminated. Even if these items were deducted from the shortfall, the bank would remain grossly undersecured.

## ISSUES

I. Whether Goodnow's failure to object to the confirmation of Adelman's Chapter 11 plan, to reject the plan by a ballot, and to appear at the confirmation hearing waived Goodnow's nondischargeability claim against Adelman, if Goodnow timely filed his complaint to determine the dischargeability of the debt.

II. Whether Adelman's unsecured debt to Goodnow is nondischargeable, if Goodnow has admitted that his injury was not the result of Adelman's misrepresentation.

1. In relevant part, 11 U.S.C. § 1141 provides:
    (a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.
    (b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.
    (c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

*Issue I*

This Court holds that Robert Goodnow did not waive his nondischargeability claim by failing to participate in the confirmation process. Confirmation of a Chapter 11 plan does not discharge an individual debtor from any debt excepted from discharge under 11 U.S.C. § 523. Goodnow preserved his right to a determination of dischargeability by timely filing an adversarial complaint. This holding is based on the following discussion.

The debtors' plan provided that Robert Goodnow's unsecured claim was undisputed, but that no dividend would be paid on the claim. Goodnow was served with the disclosure statement, the plan, and the notice of cramdown. Goodnow, however, did not return a ballot, submit an objection to confirmation, appear at the confirmation hearing, or appeal the order confirming the plan.

In essence, Adelman argues that Goodnow has waived his dischargeability claim by failing to participate in the confirmation process. In other words, Adelman contends that Goodnow is bound by the provisions of the confirmation plan "which treated his debt as dischargeable." *See* Defendant's Brief at 3.

11 U.S.C. § 1141 describes the effect of a confirmed Chapter 11 plan.[1] Nondis-

    (d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—
    (A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title....
    (2) The confirmation of a plan does not discharge an individual debtor from any debt excepted from discharge under section 523 of this title.
    (3) The confirmation of a plan does not discharge a debtor if—
    (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
    (B) the debtor does not engage in business after consummation of the plan; and
    (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.
    ....

chargeable debts are singled out for special treatment. First, an individual debtor is not discharged from any debt excepted from discharge under Section 523. 11 U.S. C. § 1141(d)(2). Second, the holders of the nondischargeable claims are not bound by the provisions of a confirmed plan. 11 U.S.C. § 1141(a); *see also In re Howell*, 84 B.R. 834, 836 (Bankr.M.D.Fla.1988). Any property dealt with by the plan is free and clear of all claims and interests, except for the nondischargeable claims. 11 U.S.C. § 1141(c). Based on these provisions of the Code, it has been held that a holder of a nondischargeable claim may execute or collect on his nondischargeable debt without regard to the discharge provisions of the plan. *See Howell*, 84 B.R. at 836.

Goodnow did not waive this special treatment under 11 U.S.C. § 1141 by failing to participate in the confirmation process. He filed his complaint to determine the dischargeability of the debt several days before the deadline set by the Court for filing such complaints. The adversary proceeding was pending when Adelman's plan was confirmed. Due to this Court's scheduling nightmare in 1987, it was impossible to determine the nondischargeability matter before confirmation of the plan. Therefore, the special treatment of nondischargeable debts should apply to those debts determined to be nondischargeable after confirmation of the plan.

Furthermore, it has been held that a creditor with a nondischargeable claim is not bound by the debtor's plan, pursuant to 11 U.S.C. § 1141(d)(2), despite the creditor's failure to participate in the confirmation process. In the Eleventh Circuit case of *In re Gurwitch*, 794 F.2d 584 (11th Cir.1986), the debtor scheduled a withholding tax claim of $12,435.93 and acknowledged in his disclosure statement an additional withholding tax claim for $21,000.00. *Id.* at 585. The Internal Revenue Service (IRS), however, filed a proof of claim for only $7,756.41. *Id.* The debtor's plan, confirmed in August, 1981, provided for 100 percent payment of the proof of claim amount. As pointed out in the bankruptcy court's decision, the IRS did not accept or reject the plan, object to confirmation, or

appeal the order confirming the debtor's plan. *In re Gurwitch*, 37 B.R. 513, 514 (Bankr.S.D.Fla.1984), *rev'd*, 54 B.R. 927 (S.D.Fla.1985), *aff'd*, 794 F.2d at 584.

After confirmation, the IRS began collection of the additional withholding tax. *In re Gurwitch*, 794 F.2d at 585. At a contempt hearing, the debtor argued that the amount of the claim had been determined by the confirmation of the plan and was binding on the IRS. *Id.* The bankruptcy court held for the debtor, but the district court reversed. *Id.* The Eleventh Circuit affirmed the district court, stating that under 11 U.S.C. § 1141(d)(2), confirmation of a plan of reorganization does not fix tax liabilities made nondischargeable under 11 U.S.C. § 523. *Id.* Taxes are nondischargeable "whether or not a claim for such tax was filed or allowed." *Id., citing* 11 U.S.C. § 523(a)(1)(A). Although both the district court and the court of appeals felt that the IRS should have been more diligent in filing its claims, they held that the additional nondischargeable claim survived the confirmation process, despite the IRS's failure to participate in the reorganization proceeding. *Id.* at 586; *In re Gurwitch*, 54 B.R. at 928.

The present case is analogous to the *Gurwitch* case. The confirmed plan did not bind Goodnow as to the dischargeability-nondischargeability of his claim, just as the *Gurwitch* confirmed plan did not bind the IRS as to the amount of nondischargeable taxes. Goodnow tolled the cut-off date for a nondischargeability complaint pursuant to Section 523(a)(2) by timely filing the complaint. Although Goodnow, like the IRS, should have been more diligent and insistent on a specific reference in the plan to the pending nondischargeability matter, this Court holds that the question of nondischargeability survives the confirmation process, despite the language of the plan and the creditor's failure to participate in the confirmation process, as long as a complaint is timely filed.

### Issue II

This Court holds that the debtor, James Adelman, told Robert Goodnow that he had

filed a financing statement, thereby securing Goodnow. This representation was false and Adelman knew the representation was false when he made it, and he made the false representation with the intent to deceive Goodnow. Goodnow relied on the misrepresentation in forgoing suit on the debt owed to him by Adelman and sustained the injury complained of as a proximate result of the misrepresentation. Although Goodnow has proven a case of non-dischargeability, he sustained no damages by forgoing collection efforts in April, 1985. Therefore, the amount of the debt to be held nondischargeable is $0. This holding is based on the following discussion.

11 U.S.C. § 523(a)(2)(A) provides, in part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

It is well settled that the creditor must prove the following criteria in order to establish the nondischargeability of a debt pursuant to Section 523(a)(2)(A):

1) that the debtor made a false representation;

2) that at the time made, the debtor knew that the representation was false;

3) that the debtor made the representation with the intent and purpose of deceiving the creditor;

4) the creditor relied on the representation in extending credit to the debtor; [2] and

5) that the creditor sustained the injury as a proximate result of the representation having been made.

*In re Ophaug,* 827 F.2d 340, 343 (8th Cir. 1987); *In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987). Each element of the creditor's claim must be proven by clear and convincing evidence. *In re Van Horne,* 823 F.2d at 1287; *In re Phillips,* 804 F.2d 930, 932 (6th Cir.1986).

The first requirement under Section 523(a)(2)(A) is a false representation by the debtor. Goodnow's primary allegation is that Adelman told Goodnow that he had executed a signed security agreement and financing statement on Goodnow's behalf and that the debt owed to Goodnow was a secured debt. The letter from Adelman to Goodnow, attached to the complaint, supports this allegation, with the exception that Adelman told Goodnow only that a UCC form had been filed for him, not that a security agreement had been executed. At his deposition, Goodnow testified simply that Adelman told him a UCC had been filed to make him a secured creditor. Adelman admitted that a UCC–1 financing statement was not filed on Goodnow's behalf. Thus, the Court finds that Adelman told Goodnow that he had filed a UCC–1 financing statement on Goodnow's behalf and that this representation was false.

Goodnow also alleged that Adelman told Goodnow that there were no prior liens or encumbrances which would defeat his priority on the hog equipment. Again, the letter from Adelman to Goodnow confirms that Adelman told Goodnow that he would be in the "No. 1 position." At the time of this representation, Norwest Bank of Ortonville was the first secured party on all Adelman's inventory, equipment, farm products, consumer goods, general intangibles, and accounts receivable, in all Adelman's businesses. If a UCC–1 had been filed for Goodnow in April, 1985, Goodnow would not have been the first secured party on the hog equipment. Therefore, the Court finds that Adelman told Goodnow that Goodnow was the first secured credi-

---

**2.** The elements of Section 523(a)(2)(A), as set forth in *In re Van Horne,* 823 F.2d 1285 (8th Cir.1987), included the creditor's *reasonable* reliance on the representations. *Id.* at 1287. The requirement of the reasonableness of the re-

liance was implicitly overruled one month later by a different Eighth Circuit panel in *In re Ophaug,* 827 F.2d 340 (8th Cir.1987). The balance of the *Van Horne* opinion remains good law.

tor on the equipment and that this representation was false.

■ Adelman also admitted that Goodnow relied on the representations and did not proceed with further efforts to become a secured creditor or to collect on the debt owed to him.[3] But Request for Admission Number 27, which has been deemed admitted by Goodnow, stated that Goodnow knew Adelman was dealing with Norwest Bank and *knew that Norwest Bank had a first priority security interest in Adelman's property.* If Goodnow knew that Norwest Bank had a first security interest in the inventory, then he could not have relied on the false representation that he was the first priority creditor. *See Matter of Garman,* 643 F.2d 1252, 1256 (7th Cir. 1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981) (dischargeability should not be denied where a creditor claims reliance on a statement it knew to be false). The Court finds that Goodnow relied on the representation that a UCC–1 had been filed to secure him, but did not actually rely on the representation that he was No. 1. Thus, Adelman's misrepresentation of a first priority security interest in the hog equipment will not support a judgment of nondischargeability, due to Goodnow's lack of actual reliance on the misrepresentation.

■ At the time Adelman made the false representation about the UCC–1 form, he knew that such a form had not been filed to secure Goodnow. Knowledge of falsity must generally be proven by a pattern of circumstantial evidence. *In re Eberle,* 61 B.R. 638, 646 (Bankr.D.Minn. 1985). Adelman's prior financial transactions with Norwest Bank and one of his own debtors in Minnesota demonstrate that Adelman knew, at the very least, that a debtor must sign the UCC–1 form before the creditor can become secured.

In Adelman's early dealings with Norwest Bank, Adelman and his wife signed several UCC–1 financing statements as "debtors," as well as several security agreements as "debtors." Later, the operators of Upper Midwest Agri–Products, Falls Livestock Equipment Center, and Plains Agri–Sales had to sign security agreements and financing statements as "debtors" of James and Betty Adelman. For example, bank officer Gere told Adelman that Koch and Peterson of Upper Midwest Agri–Products had to sign so that a lien could be taken on the property of Upper Midwest to secure him, and thereby, secure the bank. Gere told Adelman that "it" [the signing and filing of the documents] protected Jim and also the bank. Thus, Adelman had his first lesson in secured transactions.

In February, 1985, Adelman had his second lesson. Several months before the false representations to Goodnow, Attorney McLaughlin helped Adelman obtain a security interest in inventory and equipment owned by Bart's Agri–Service, Inc., of Emmons, Minnesota. Adelman had loaned cash, inventory, and equipment to Bart's, and wanted to be sure he was going to collect on the debt. When Adelman learned that Bart's was in great financial difficulty and that Bart's bank was going to conduct a liquidation sale of the assets, Adelman went to McLaughlin for advice.

Adelman thought that he was a secured creditor of Bart's, but McLaughlin found out for Adelman that he was unsecured. There were two other secured parties, and the IRS and two Minnesota state agencies had prior statutory liens. McLaughlin's office prepared a security agreement and financing statement, and Adelman himself took the documents to Emmons in order to get them signed by the appropriate parties at Bart's. After Bart's liquidation, Adelman, as the last-in-time secured party, received nothing in the distribution. At a minimum, Adelman learned that the debtor has to sign some document in order that the creditor becomes "secured" on the personal property, i.e., hog equipment, and that if the creditor is last to file, he might receive nothing.

---

**3.** It has been held that a creditor's forbearance from exercising rights can constitute a "renewal" or "refinance" within the meaning of Section 523(a)(2)(A). *In re Eberle,* 61 B.R. 638, 645 (Bankr.D.Minn.1985).

The Court finds that Adelman knew, at the time the representation was made, that the debt to Goodnow was not secured by the hog equipment. He had learned that a debtor has to sign a document in order that the creditor become "secured" on personal property.[4] He knew that the appropriate document was called a "UCC form," as evidenced by his use of the term on the telephone with Goodnow and in his confirmatory letter. He did not sign a "UCC form" to protect Goodnow. There is no evidence of other security agreements or financing statements signed in April, 1985, which might have confused a lay person such as Adelman. Consequently, this Court finds that Adelman knew that he had made a false representation to Goodnow.

Next, the Court must determine whether Adelman intended to deceive Goodnow by making the false representation. This scienter element of Section 523(a)(2)(A) may logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan (or forgo enforcing available rights). *In re Kimzey*, 761 F.2d 421, 424 (7th Cir. 1985), *citing Carini v. Matera*, 592 F.2d 378, 380 (7th Cir.1979); *see also In re Phillips*, 804 F.2d at 934. The debtor's knowledge that the false representation will influence another's action or inaction may be inferred from circumstantial evidence. *See In re Van Horne*, 823 F.2d at 1287.

This Court finds that Adelman intended to deceive Goodnow by representing that a UCC–1 had been filed on Goodnow's behalf. In the early months of 1985, Goodnow pressed Adelman for security on the $65,-000 debt. Goodnow was nervous about the unsecured debt and it is logical to infer that his nervousness was communicated to Adelman. About the same time, Adelman was in the middle of the Bart's Agri–Service fiasco and also was working with Norwest and his other major secured lender, Tri–County State Bank, to cash out Tri-County and then consolidate his loans with Norwest. Adelman could not afford to have Goodnow disturb his already shaky "empire" with a collection suit.

It also may be inferred that Adelman knew Goodnow was not experienced in the sophisticated business and commercial world, since Goodnow formerly ran Upper Midwest from his farm near Armour. When the debt originally was due in May, 1984, Adelman put off Goodnow with assurances that payment would be coming soon and that buying a new store in Sioux Falls would help the whole buying system [of the hog equipment business network]. In July, 1984, Adelman and Goodnow visited Goodnow's bank in an attempt to persuade the bank to allow Adelman to take over Goodnow's note. Adelman conveniently did not bring financial statements or evidence of security to the meeting at the bank, and thus, the bank refused to extend credit to him. Adelman again assured Goodnow that he would be paid. From Goodnow's past acceptances and belief in Adelman's assurances, Adelman knew that Goodnow would accept the assurance of security and would not continue to press Adelman for security or to proceed with collection efforts. Thus, the Court concludes that Adelman wanted to get this unsophisticated farmer off his back and knew that the assurance of security would accomplish this end.[5]

In his brief, Adelman claimed that Goodnow's deposition testimony revealed that Goodnow did not believe Adelman was trying to defraud him. In response to the question of whether Goodnow felt "that Jim wanted to beat you out of this money or is it just kind of he got caught up in this whole big financial deal," Goodnow responded, "I don't think Jim—I think he just got caught up—just got over his head." This statement simply supports the other evidence of Adelman's deteriorating finan-

---

**4.** It is immaterial to this proceeding that a security agreement is also a necessary part of a secured transaction.

**5.** It is irrelevant whether Adelman intended to eventually pay Goodnow or not pay him. Adelman made a false representation about Good-now's status as a secured creditor, that he knew to be false, and upon which he knew Goodnow would rely. Therefore, he intended to deceive Adelman about the security interest and thereby receive an "extension" or "renewal" of credit.

cial situation in the spring of 1985. Adelman had to stop Goodnow from filing the lawsuit or repossessing the hog equipment at the Mitchell store. This statement does not serve to show Adelman's subjective lack of intent to deceive.

■ The most difficult criteria of Section 523(a)(2)(A) for a bankruptcy court to analyze is the proximate cause element. This requirement has been defined as a finding that "the action of the debtor was the act, without which the claimant would not have suffered the loss complained of." *In re Van Horne*, 823 F.2d at 1288, *quoting In re Maier*, 38 B.R. 231, 233 (Bankr.D. Minn.1984). To put it more clearly, the creditor must show by clear and convincing evidence that the misrepresentation was a significant factor in the extension of credit (or forbearance) in the absence of which the extension (or forbearance) would not have been made. *In re Mutschler*, 45 B.R. 482, 492 (Bankr.D.N.D.1984) (the false financial statement was not only the principal factor, but the only factor employed by [the creditor] in its decision to extend credit to Mutschler); *see also In re Kroh*, 88 B.R. 972 (Bankr.W.D.Mo.1988) (absent the debtor's misrepresentations, the bank would not have loaned the money to the debtor and the damage would not have occurred); *In re Tesmetges*, 74 B.R. 911, 917 (Bankr.E. D.N.Y.1987), *aff'd*, 86 B.R. 21 (E.D.N.Y. 1988) (creditor failed to establish proximate causation, because creditor relied almost entirely on a second mortgage of the property, not on the false representation that the property was the subject of a contract for sale); *In re Bonefas*, 41 B.R. 74, 79 (Bankr.N.D.Iowa 1984) (creditor would not have extended credit to acquire the property but for the debtor's false representations); *Restatement (Second) of Torts* § 546 at 102 (1977) (plaintiff's reliance on the misrepresentation must be the substantial factor in determining the course of conduct that results in his loss). Therefore, a finding of proximate cause is based on the degree of reliance and the effect of that reliance. *See In re Mutschler*, 45 B.R. at 492.

■ In the present case, it is implicit in Goodnow's testimony that his reliance on Adelman's misrepresentation was not only the principal factor but the sole factor in his decision not to start a collection action or to repossess the hog equipment. No one can dispute that Goodnow would take Adelman at his word, because small-town South Dakotans conduct their business affairs in that manner. Adelman produced no evidence that Goodnow had other information or influence, upon which he relied, other than Adelman's assurance that he was secured. As a result of his reliance, Goodnow is an unsecured creditor in Adelman's bankruptcy, which is the injury he now complains of. The Court is satisfied that but for Adelman's false representation, Goodnow would not have held off enforcing his rights.[6]

As outlined above, the plaintiff has proven by clear and convincing evidence each element of a cause of action for nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A). Goodnow has shown that Adelman made two false representations. But Goodnow actually relied on only one of these representations: that he was secured on the hog equipment. He has admitted that he knew Norwest Bank was the first secured party on the hog equipment and, therefore, could not have actually relied on that false representation. Adelman knew that the representation was false and he intended to deceive Goodnow by making the representation. But for this representation, Goodnow would not have abstained from further collection efforts. Thus, Goodnow has proven a case of nondischargeability based on the representation that he was a secured creditor, but not on the representation that Goodnow was in a first priority position.

■ The last step in this Court's analysis is a determination of the amount of the

---

**6.** The Court rejects Adelman's argument that there is no proximate cause shown in the case. Adelman has confused the element of proximate cause with the issue of damages. As noted above, proximate cause is a function of reliance and is not related to the amount of pecuniary loss incurred by the creditor.

debt to be held nondischargeable. The Eleventh Circuit has held that the nondischargeability of a debt is an "all or nothing" proposition. *Birmingham Trust Nat'l Bank v. Case,* 755 F.2d 1474, 1477 (11th Cir.1985). The *Birmingham Trust* opinion is not in complete accord with the 1984 amendments to 11 U.S.C. § 523(a)(2), which added the phrase, "to the extent obtained by," to that subsection. *Muleshoe State Bank v. Black,* 77 B.R. 91, 92 (N.D.Tex.1987), *citing In re Church,* 69 B.R. 425, 435 (Bankr.N.D.Tex.1987), and 3 *Collier on Bankruptcy* ¶ 523.08 at 523–39 (L. King 15th ed. 1987). It has been held that this phrase requires that an actual pecuniary loss to the creditor result from the fraudulent conduct of the debtor. *In re Church,* 69 B.R. at 435.

In the present case, the Court will measure the actual pecuniary loss to Goodnow by use of the benefit-of-the-bargain rule. This rule has been adopted by other bankruptcy courts when a debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). *See, e.g., In re Samford,* 39 B.R. 423, 427 (Bankr.M.D.Tenn.1984), *citing In re Wilson,* 12 B.R. 363, 370 (Bankr. M.D.Tenn.1981). This is also the proper measure of damages for deceit, fraud, and misrepresentation in South Dakota. *See Schmidt v. Wildcat Cave, Inc.,* 261 N.W.2d 114, 119 (S.D.1979); *Ward v. Dakota Tele. and Elec. Co.,* 49 S.D. 135, 148–49, 206 N.W. 695, 700 (1925); *Hallen v. Martin,* 40 S.D. 343, 352–53, 167 N.W. 314, 317 (1918). Pursuant to the benefit-of-the-bargain rule, the amount of the debt to be declared nondischargeable is the amount representing the difference between the value of what [the plaintiff] actually received and what the value would have been if the representation had been true. *Hallen,* 40 S.D. at 354–56, 167 N.W. at 318.

■ It should be noted that the damage complained of and caused by Adelman's deceit is *not* the original $65,000 debt. Goodnow does not allege fraud in the incurrence of the obligation. Instead, the damage complained of and caused by the defendant's deceit is the failure to have a security interest in the hog equipment or in some other property.

This Court will not put Goodnow in the position of a first priority secured creditor. Goodnow has admitted that he knew Norwest Bank had a first priority security interest in all Adelman's personal property. As discussed above, any statement that Goodnow was the first secured creditor on the personal property is not actionable, because Goodnow could not rely on such a statement. Thus, the "damages" awarded should put Goodnow in the place he would have been if Adelman had created a security interest in the personal property for Goodnow at the time of the misrepresentation.

Goodnow admitted that at the time of the alleged misrepresentation there was no unsecured personal property in which Goodnow could have taken a first priority interest. Also, there was no property in excess of Norwest Bank's first priority security interest. These admissions are supported by Requests for Admission Numbers 8 and 9 and bank officer Gere's testimony which show that Norwest Bank was undersecured at the time of the misrepresentation and at the time of the bankruptcy filing. Adelman also has admitted that a second priority lien interest in any of the personal property would have been valueless.

Above all, Goodnow admitted that "the alleged injury was not sustained as a result of the alleged misrepresentation." Adelman argued in his brief that this admission defeated the proximate cause element of the cause of action. *See* footnote 6. Instead, this Court interprets that admission to mean that no damages were sustained as a result of the misrepresentation, in light of Goodnow's other admissions. In other words, Goodnow admitted that there was no property in which he could have taken a worthwhile lien at the time of the misrepresentation. This admission resolves any question of damages in Adelman's favor.

The Court holds that the amount of Adelman's debt to Goodnow to be declared nondischargeable is $0. The difference between the value of what Goodnow received

as an unsecured creditor in the Adelman bankruptcy and the value of what he would have received if Adelman had granted him the security interest is nothing. Thus, Goodnow was not damaged by his failure to get a security interest.

 Both parties have requested attorneys' fees in this matter. In fact, Adelman filed a counterclaim for attorneys' fees pursuant to 11 U.S.C. § 523(d).[7] It is obvious that the debt for the hog equipment to be sold at the Mitchell store was not a consumer debt. Moreover, Goodnow's position was substantially justified. Therefore, Adelman's counterclaim for attorneys' fees will be dismissed.

 Goodnow also requested attorneys' fees. The Bankruptcy Code and Rules make no provision for an award of attorneys' fees to a prevailing creditor. *In re Hunter,* 771 F.2d 1126, 1131 (8th Cir.1985); *In re Martin,* 761 F.2d 1163, 1167–68 (6th Cir.1985). Creditors are entitled to recover attorneys' fees in bankruptcy claims if they

have a contractual right to them valid under state law. *See In re Hunter,* 771 F.2d at 1131; *In re Martin,* 761 F.2d at 1168. In Goodnow and Adelman's oral agreement, no provision existed authorizing the recovery of attorneys' fees. Thus, Goodnow is not entitled to attorneys' fees in this case.

Accordingly, the above and foregoing hereby constitute the Court's findings of fact and conclusions of law in the above-entitled matter pursuant to Bankr.R.P. 7052 and Fed.R.Civ.P. 52. Counsel for the plaintiff should prepare a judgment in accordance herewith pursuant to Bankr.R.P. 7056 and Fed.R.Civ.P. 56.

---

7. 11 U.S.C. § 523(d) states:

(d) If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.