**In re James Lofton WINFREE, Debtor.**

**Robert Wayne BATES, Plaintiff,**

v.

**James Lofton WINFREE, Defendant.**

**Bankruptcy No. 382–01876.**
**Adv. No. 382–0607.**

United States Bankruptcy Court,
M.D. Tennessee.

Nov. 9, 1983.

Alf Adams, Jr., Adams, Taylor, Philbin, Pigue & Marchetti, Nashville, Tenn., for plaintiff.

Harry D. Lewis, Nashville, Tenn., for defendant.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

This is a false financial statement case under 11 U.S.C.A. § 523(a)(2)(B) (West 1979). After consideration of the testimony, exhibits, briefs, arguments of the parties and applicable authority, the court finds that the debt at issue is NONDISCHARGEABLE.

The following constitute findings of fact and conclusions of law as required by Rule 7052 of the Bankruptcy Rules.

The defendant/debtor, James Lofton Winfree ("Winfree"), is a fifty-year old businessman whose education includes a law school degree. Winfree has considerable business experience and is a sophisticated entrepreneuer. He has operated at least eight different companies, has substantial experience in the insurance industry and has participated in a number of significant real estate development ventures.

In the Spring of 1979, Winfree joined with two land developers, Gary Patrick ("Patrick") and Ned Hansen ("Hansen"), to develop truck stops in Greenwood, Indiana and Shawnee Mission, Kansas. Winfree's role was to raise money for the projects. In the Spring of 1980, Winfree, Hansen, Patrick, Joe Borenstein ("Borenstein"), a lawyer and accountant, and Bob Gann ("Gann"), another real estate developer, founded Mid-Western Holding and Development Corporation ("Mid-West"). The asserted purpose of Mid-West was to provide an asset base to fund a variety of projects. Apparently, each of the five incorporators was prepared to contribute assets or services to Mid-West in exchange for corporate stock.[1] The pooling of individual assets was intended to allow the group to engage in larger and more sophisticated ventures. Mid-West's first "stockholders"[2] meeting was held in February of 1981. Winfree was elected president and also served as a member of the board of directors. Hansen was elected executive vice-president, Gann as vice-president, Patrick as secretary, and Borenstein as treasurer.

Subsequent to the February, 1981 meeting, Winfree proposed that Mid-West acquire a controlling interest in an insurance firm, J.L.W. and Company. Winfree had once been an owner of J.L.W. and Company, but had sold his interest to a businessman named Sam Lewis ("Lewis") in 1979.

In April of 1981, Winfree contacted Lewis concerning the repurchase of J.L.W. and Company. A sale price was negotiated and Mid-West tendered a corporate check as downpayment. The check was returned for insufficient funds on April 27, 1981. Unable to raise money from his personal resources, on June 1, 1981, Winfree went to the offices of John Shankle, another friend and former business associate, to seek a $50,000 loan to Mid-West for the downpayment on the J.L.W. and Company stock. Shankle was unavailable. Winfree instead discussed the possibility of a loan with the plaintiff, Robert Wayne Bates ("Bates"), who worked at Shankle's office. Winfree and Bates had known each other for approximately 15 years. They were involved together in the development of a subdivision, an office building, and a liquor store and Bates had previously loaned Winfree $4,000, fully secured by the assets of one of Winfree's many companies.

Before agreeing to make a loan, Bates requested Mid-West's financial statement. Winfree provided Bates with a Mid-West financial statement. The statement was originally dated March 31, 1981. Winfree obtained the statement from Hansen and changed the date to May 31, 1981. The financial statement listed numerous assets including substantial cash, accounts and contracts receivable, mining equipment, an airplane, office furniture, a six percent interest in a gold mine, a truck stop, two land development partnerships, a 54 percent interest in J.L.W. and Company, an electric tricycle patent, and four tracts of real estate. The statement revealed few liabilities and represented Mid-West's net worth precisely at $5,435,140. After examining Mid-West's statement, Bates requested financial statements for Winfree, Hansen, and Patrick and their personal guaranties on the loan. Winfree supplied Hansen's personal financial statement, but explained that it

---

1. It does not appear from the record that Borenstein had any assets which were to become part of Mid-West. Borenstein, however, agreed to provide legal and accounting services to the corporation in exchange for stock.

2. The testimony at trial referred to this meeting as a "stockholders' meeting" although no Mid-West stock was ever issued.

was overstated because it included assets contributed to Mid-West. Winfree stated that Patrick was not worth anything.

Bates agreed to make the loan and delivered a $50,000 check to Winfree payable to Sam Lewis. Bates received a $50,000 promissory note signed by Winfree as president of Mid-West and Winfree's personal guaranty. Hansen personally guaranteed the note the following day. The note was never paid. The assets listed on the Mid-West financial statement were never contributed to Mid-West.

Winfree resigned as president of Mid-West in March of 1982 and filed a Chapter 7 petition on June 11, 1982. Winfree scheduled Bates as an unsecured creditor. On September 16, 1982, Bates filed a complaint objecting to the dischargeability of the $50,-000 debt. A trial was held April 7 and 8, 1983.

▬ Bates argues that his debt is nondischargeable because the loan was procured through the use of a materially false financial statement. This court has recently discussed in some detail the standards and burdens of proof in a false financial statement case. *See Heinold Commodities & Securities, Inc. v. Hunt,* 30 B.R. 425 (Bkrtcy.M.D.Tenn.1983). 11 U.S.C.A. § 523(a)(2)(B) (West 1979) provides in relevant part:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

Exceptions to discharge are strictly construed in favor of the debtor. *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915). *See also Murphy & Robinson Investment Co. v. Cross,* 666 F.2d 873, 880 (5th Cir.1982); *Kansas State Bank & Trust Co. v. Vickers,* 577 F.2d 683, 687 (10th Cir.1978); *Household Finance Corp. v. Danns,* 558 F.2d 114, 116 (2d Cir.1977). The creditor bears the burden to prove each of the requisite elements. *Heinold Commodities & Securities, Inc. v. Hunt,* 30 B.R. 425, 436 (Bkrtcy.M.D.Tenn.1983). *See also Household Finance Corp. v. Danns,* 558 F.2d at 116; *Public Finance Corp. v. Taylor,* 514 F.2d 1370 (9th Cir.1975).

## I. OBTAINING MONEY

Construing the concept of "obtaining money" in § 523(a)(2) narrowly, Winfree contends that Mid-West, not Winfree, "obtained" money from Bates, thus Winfree cannot be responsible under § 523(a)(2)(B).

There is disagreement among the courts whether a debtor must personally possess or consume the money or services at issue in a false financial statement case before nondischargeability can apply. Three different approaches have emerged. As Judge Paskay explained in *Century First National Bank v. Holwerda,* 29 B.R. 486, 489 (Bkrtcy. M.D.Fla.1983):

According to one view, unless the debtor actually obtained money or property for himself through false representations, the debt remains dischargeable. *See Rudstrom v. Sheridan,* 122 Minn. 262, 142 N.W. 313, 314 (1913).

The opposite view appears in an early district court decision interpreting Section 17 of the former Bankruptcy Act:

The bankrupt contends that section 17a applies only to a case where the bankrupt himself obtained property for himself by such false pretenses or false representation, and that the intent and purpose of the act was not to permit him to retain such property as against the person defrauded, and at the same time secure through bankruptcy a discharge of the debt or liability arising out of the fraud.

This seems to me to be begging the question. To adopt the interpretation suggested by the bankrupt would be to rewrite the section so as to read: "A discharge in bankruptcy shall release a bankrupt from all his provable debts, except such as ... are liabilities for obtaining property [for himself] by false pretenses or false representation."

If that had been the intention of the congress, the act could have been so worded. There is no exception contained in or suggested by the act as to liabilities for obtaining property by false pretenses or false representation. *It applies plainly to all such obtaining of property by the bankrupt, whether for himself or for anybody else.* The rule of statutory construction is that, where the language of the statute is plain, it is not susceptible to interpretation, and the letter of the law will prevail. (emphasis added).

*In re Kunkle,* 40 F.2d 563, 563–564 (E.D. Mich.1930). *See also Harris v. Pirnie,* 16 B.R. 65 (Bkrtcy.D.Mass.1980) ("Section 17(a)(2) applies even when a bankrupt fraudulently obtains property for a party other than himself.") A third view, which might be characterized as the "receipt of benefits" theory, was ultimately adopted by Judge Paskay in *Century First National Bank v. Holwerda,* 29 B.R. at 489:

> The better view, however, appears to be that the debtor need not actually procure money or property for himself. If the debtor benefits in some way from the property obtained through his deception, the debt is nondischargeable. *See, Hyland v. Fink,* 178 N.Y.Supp. 114, 115 (1919); 3 COLLIER ON BANKRUPTCY, ¶ 523.08[1] (15th ed. 1982).

*See also McCloud v. Woods (In re Tom Woods Used Cars, Inc.),* 23 Bankr. 563, 569

(Bankr.E.D.Tenn.1982) ("The rule must rest on the common sense conclusion that a person will seldom go to the trouble of obtaining money by wrongful means unless the person realizes some benefit for himself, though the money actually goes to another.")

■ It is not necessary on the facts of this case to define the outer boundaries of the concept of "obtaining money" under § 523(a)(2). Financial benefit to the debtor [3] is a *sufficient* condition to a finding that the debtor "obtained money" under § 523(a)(2).[4] Where the debtor is a shareholder, officer and director of a corporation and the debtor uses a false financial statement to induce a creditor to make a loan to the corporation, the debtor has "obtained money" within the meaning of § 523(a)(2). *See Century First National Bank v. Holwerda,* 29 B.R. at 489.

## II. MATERIAL FALSITY

■ Winfree next argues that because the asset values on the financial statement were approximately correct, the statement was not materially false. The court, however, finds that the financial statement contains fundamental material inaccuracies. First, Mid-West had no available cash although the financial statement listed cash assets of $37,200. Winfree knew that Mid-West had no cash because the first check for the downpayment on J.L.W. and Company had been returned by Mid-West's bank. The financial statement also reflects J.L.W. and Company as an unencumbered asset although the company was subject to a known substantial deferred liability. The airplane (which had been wrecked) was listed as a separate asset of Mid-West and included as a corporate asset of J.L.W. and Company. Several of the tracts of land

**3.** Winfree was an owner of Mid-West thus he benefited financially from Mid-West's acquisition of J.L.W. and Company and would continue to benefit from any resulting prosperity to Mid-West. Winfree had an agreement with Mid-West entitling him to receive commissions from Mid-West for sales made through J.L.W. and Company after its acquisition. Testimony at trial also revealed that Winfree was experiencing difficulties with a personal loan at Unit-

ed American Bank of Nashville and the reacquisition of J.L.W. and Company would, in some unexplained manner, ease the financial pressures caused by that loan.

**4.** Reserved for future consideration is the question whether benefit to the debtor (financial or otherwise) is also a *necessary* condition.

listed as assets were not owned by Mid-West but were merely the objects of unconsummated negotiations for sale. Most importantly, it is undisputed that *none* of the properties, regardless of value, ever actually became assets of Mid-West—the asset list on the financial statement was an unfulfilled "wish list" of what Winfree hoped his business partners would eventually acquire and contribute to the company. The misrepresentation of ownership of assets and the failure to divulge the true ownership interests in the listed property is "material falsity" for purposes of § 523(a)(2)(B). *See, e.g., Long Island Trust Co. v. Rodriguez,* 29 B.R. 537, 541 (Bkrtcy.E. D.N.Y.1983) (failure to disclose joint ownership of property with wife renders debt nondischargeable); *First Westside National Bank v. Voeller,* 14 Bankr. 857, 859 (Bkrtcy. D.Mont.1981) (debt nondischargeable where financial statement listed property with a value of $12,000 which the debtor's had not yet purchased); *Sun Bank and Trust Co. v. Rickey,* 8 B.R. 860, 863 (Bkrtcy.M.D.Fla. 1981) (failure to disclose true ownership of certificates of deposit).

■ "Materiality" for purposes of § 523(a)(2)(B) requires more than simply evaluating the accuracy of the information provided. The information must not only be substantially inaccurate, but must be information that affected the creditor's decisionmaking process.[5] The plaintiff has satisfied this prong of the test as well. Mid-West's (nonexistent) ownership interests in property was unquestionably important to Bates' decision to make the loan. Bates was evaluating and relying upon the represented financial condition of Mid-West, not upon the potential sum of assets which Winfree and his associates might string together with a corporate shell. Materiality is established.

## III. FINANCIAL CONDITION

■ Winfree argues that because the statement does not make representations concerning his personal financial condition, § 523(a)(2)(B) does not apply. The Bankruptcy Code, however, does not require that the tendered statement concern the debtor's financial condition. Section 523(a)(2) states that the financial statement may concern the debtor's *or* an "insider's" financial condition. 11 U.S.C.A. § 101(25)(A)(iv) (West 1979) defines an insider as a "corporation of which the debtor is a director, officer, or person in control." Winfree, as president and a director of Mid-West, misrepresented the financial condition of an insider when he used Mid-West's financial statement.

## IV. RELIANCE

■ The plaintiff must demonstrate actual reliance on the false financial statement that was reasonable under the circumstances. *Heinold Commodities & Securities, Inc. v. Hunt,* 30 B.R. at 447. *See also McDowell v. John Deere Industrial Equipment Co.,* 461 F.2d 48 (6th Cir.1972); *Bank of Putnam Cty. v. West,* 21 B.R. 872, 875 (Bkrtcy.M.D.Tenn.1982). Winfree argues that Bates relied on Winfree's reputation and the individual guaranties, not on the false financial statement. Winfree also argues that Bates' reliance was unreasonable. Bates testified that he relied on the financial statement and that the financial statement was the primary motivating factor in his decision to make the loan. The court finds Bates' testimony credible and believable and that Bates' reliance was reasonable under the circumstances.

■ None of the factors asserted by Winfree either singularly or in combination is sufficient to warrant a finding of unreasonable reliance. Reliance by Bates is not negated by his prior business relationship with Winfree. The prior loan between the parties was a fully secured transaction and involved a relatively small amount of money. The parties' relationship was not such as would create a regular course of dealings. Bates could not have been relying on Hansen's guaranty because Hansen did not

---

**5.** Although there is similarity between analysis of "materiality" and analysis of "reasonable reliance," discussed *infra*, consideration of a creditor's use of financial information is appropriate in both contexts. *Heinold Commodities & Securities, Inc. v. Hunt,* 30 B.R. at 440.

sign the promissory note until the day after the check was delivered. Bates could not have relied on the guaranty of Patrick because it was never received. Although it is arguable that Bates was influenced by his past dealings with Winfree and Winfree's guaranty, the multi-million-dollar financial statement of Mid-West was a substantial if not the pivotal inducement. *See First National Bank v. Clancy,* 279 F.Supp. 820, 822 (D.Colo.1968) *aff'd,* 408 F.2d 899 (10th Cir.) *cert. denied,* 396 U.S. 958, 90 S.Ct. 430, 24 L.Ed.2d 422 (1969); *Bazemore v. Stehling,* 396 F.2d 701, 703 (5th Cir.1968); *Wylie v. Ward,* 292 F.2d 590, 592 n. 2 (9th Cir.1961); *Banks v. Siegel,* 181 F.2d 309, 310 (4th Cir.1950); *Lincoln First Bank v. Tomei,* 24 B.R. 204 (D.C.W.D.N.Y.1982); *Waterbury Community Federal Credit Union v. Magnusson,* 14 B.R. 662 (Bkrtcy.N.D.N.Y.1981).

■ Winfree argues that Bates' reliance was unreasonable because he failed to investigate the accuracy of the financial statement. Although a plaintiff cannot assert reasonable reliance on a financial statement that he knew or should have known was inaccurate or incomplete, *see, e.g., Heinold Commodities & Securities, Inc. v. Hunt,* 30 Bkrtcy. at 450; *Kentile Floors, Inc. v. Winham,* 440 F.2d 1128 (9th Cir. 1971); *Bryn Mawr Trust Co. v. Klein,* 20 B.R. 119 (Bkrtcy.E.D.Pa.1982), such is not here the case. Winfree makes no assertion that Bates had knowledge of facts that would render reliance unreasonable. The court cannot find from the proof that Bates should have known that the financial statement was false or that further inquiry was mandatory. Although interests in gold mines and patents are somewhat uncommon, Winfree assured Bates that he had personal knowledge of both the existence and the value of the assets and no proof was offered that the values of these unconventional assets were inflated or inaccurate. The financial statement itself contains no information requiring further investigation, nor is there any claim that further investigation would have uncovered the inaccuracies in the statement. *See Northern Trust Co. v. Garman,* 643 F.2d 1252, 1259 (7th Cir.1980). Winfree has not suggested or

proven that Bates is a particularly sophisticated lender or that any special "industry standard" or "business practice" is applicable to this personal loan or that any such elevated standard of care was breached by Bates. *See, e.g., First Security Bank v. Ardelean,* 28 B.R. 299, 301 (Bkrtcy.N.D.Ill. 1983); *In re Hagedorn,* 25 B.R. 666 (Bkrtcy. S.D.Ohio 1982).

## V. INTENT

■ In this case, Winfree claims subjective good intent: Winfree testified that he believed that the assets on the financial statement would be contributed to Mid-West, therefore, he was not intentionally deceiving Bates. Winfree's statement of honest intent is rebutted by the proof. Winfree knew that none of the assets on the financial statement had been conveyed to Mid-West. Winfree knew that no schedule or contract existed to require contribution of assets to Mid-West. To the contrary, Winfree knew that several projects of the Patrick Land Development Partnerships which were to become primary assets of Mid-West had been abandoned or never commenced. Winfree knew that Hansen had attempted to mortgage the mining equipment and had been completely unsuccessful in locating a lender. Winfree knew that several of the real estate parcels listed on the financial statement were subject to complicated sale arrangements and were not available to Mid-West. Winfree knew that Mid-West had no cash assets because Mid-West had issued an insufficient funds check in April in the original attempt to purchase the stock of J.L.W. and Company. Winfree knew that the financial statement did not reflect as a liability the deferred payments necessary to complete the purchase of J.L.W. and Company and that the airplane had been counted twice. Despite all this knowledge, Winfree expressly represented to Bates that the loan was "very safe" because Mid-West owned assets in excess of five million dollars. Winfree had a substantial financial stake in the reacquisition of J.L.W. and Company and Winfree knew that Bates would not loan $50,000 to

Winfree personally, or to a corporation with no assets or net worth. These facts overcome Winfree's claim of good intent and support a finding of nondischargeability.

 Accordingly, all elements of this § 523(a)(2)(B) complaint have been proven and the debt is declared NONDIS-CHARGEABLE.