In re Neil A. AURICCHIO, Debtor.

Martin DALY and Virginia
Daly, Plaintiffs,

v.

Neil A. AURICCHIO, Defendant.

Bankruptcy No. 94–36171.
Adv. No. 95–3064TS.

United States Bankruptcy Court,
D. New Jersey.

June 6, 1996.

---

Christine Cline, Drobenko & Piddoubny, Astoria, New York, for Martin and Virginia Daly.

Michael Schwartzberg, Law Offices of Harvey Schwartzberg, Elizabeth, New Jersey, for Neil A. Auricchio.

---

* The only amendment reflected in this opinion to that which was filed on January 18, 1996 is that the Court has deleted the instruction *"NOT FOR PUBLICATION "* and has submitted the opinion for publication.

*AMENDED MEMORANDUM OPINION* *

STEPHEN A. STRIPP, Bankruptcy Judge.

This is the court's decision on an adversary proceeding to determine the dischargeability of debts under section 523(a)(2), (4) and (6) of title 11, United States Code (hereinafter "Bankruptcy Code" or "Code"). This court has subject matter jurisdiction under 28 U.S.C. § 1334(b), 151 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The court's findings of fact and conclusions of law are as follows.

## FINDINGS OF FACT

On August 22nd and 23rd, 1992, Martin and Virginia Daly, the plaintiffs, attended a seminar conducted by Mr. Dave Del Dotto at the Crowne Plaza Hotel in New York City.[1] At the seminar, the defendant, Neil Auricchio (hereinafter "Auricchio") was a speaker who discussed potential investments in properties located in New Jersey, including Newark and Elizabeth. The focus of Auricchio's lecture was financing techniques for purchasing and refurbishing properties in low income areas which could generate substantial returns on investment. The techniques discussed by Auricchio were based on two principal means of financing: government grants and "203K"[2] loans, which were low interest government loans.

After Auricchio presented his lecture at the Crowne Plaza, he invited participants to view certain properties on one of three buses headed to either New York or New Jersey. Mr. Daly joined the bus headed to New York while Auricchio led a bus to New Jersey. After the so-called "bus tours" were complete, Auricchio fielded questions from participants and then invited investors to form partnerships with him for the purpose of purchasing properties.

---

1. Martin Daly attended the first day of the seminar by himself and was joined by Virginia Daly on the second day.

2. The record does not reflect the statutory provision to which "203K" refers.

Before discussing the partnerships, Auricchio described certain parcels of real property which were available. The Dalys expressed an interest in two Newark properties, one of which was a 3–family burnt-out dwelling located at 690 South 20th Street and the other a dwelling in move-in condition at 453 South 18th Street. Auricchio indicated that the purchase price for the 690 South 20th Street property was $30,000 plus closing costs of $7,000 and a finder's fee of $2,500. In addition, Auricchio stated that the total construction cost to refurbish the building was $90,000, which would be funded by $25,500 in grant money which had already been "lined up" and with a $64,500 construction loan. Therefore, the total cost to the Dalys of purchasing and refurbishing 690 South 20th Street would be $104,000.

After learning more about the two properties, the Dalys decided to purchase both in partnership with Auricchio. At the end of the meeting, the Dalys exchanged phone numbers with Auricchio and provided him with a check in the amount of $2,500 as down-payment for the South 18th Street property.

The following day, Auricchio phoned Virginia Daly and described the proposed partnership for the South 20th Street property, in which the Dalys were to contribute cash for the downpayment and their credit towards the financing of the balance of the purchase price and the rehabilitation of the property. For his part, Auricchio promised that East Coast Properties, Inc., a company owned and operated by Auricchio, would handle all communications and negotiations with the seller of the property and contribute his expertise in guiding the Dalys in financing, rehabilitating and renting the property. Auricchio assured Mrs. Daly that he would provide them with the necessary contacts to accomplish these goals. Auricchio also stated that the proposed partnership would provide that the net profits and losses would be shared equally by the partners.

After discussing the proposed partnership, Auricchio reiterated that as part of their responsibilities under the proposed partnership the Dalys would have to contribute the down payment and the closing costs. The Dalys were told to provide a check in the amount of $9,000 to the law firm of Lynch Martin & Philibosian for the South 20th Street property and a check in the amount of $8,700 for the balance on the South 18th Street property. The Dalys submitted the two checks on August 28, 1992. It is important to note that at no time did Auricchio tell Virginia Daly that they would have to take any affirmative action in an effort to obtain the $25,500 in grant money. In fact, Auricchio led Mrs. Daly to believe that the grant money had already been allocated for the property.

Shortly thereafter, the Dalys viewed the 690 South 20th Street property, signed the partnership agreement and met with two representatives of Auricchio, Jeff Meiser and Jack Wynn, to apply for a 203K loan. The Dalys then received a copy of the contract of sale for the property which indicated that the seller was Henry Zulferino and the purchaser was Glen Ledig. Attached to the contract of sale was an assignment from Glen Ledig to the Dalys of the right to purchase the South 20th Street property. The contract provided that Henry Zulferino would take back a mortgage in the amount of $24,000 with payments to begin five months after the closing.

Prior to closing on the property, Auricchio provided a "qualifying sheet" to the Dalys. The qualifying sheet was a detailed financial analysis of the total cost, appraisal and the projected monthly and annual return on the property. The projected net monthly return was $1,178.33, of which the Dalys' share would be $589.16 a month pursuant to the partnership agreement.

Based on information in the "qualifying sheets" and the assurances of Auricchio that he would guide the Dalys through every step of the purchase, financing, rehabilitation and rental of the property, the Dalys closed on it on November 10, 1992. Title to the property was taken in the names of the Dalys, and they executed a mortgage in favor of Henry Zulferino in the amount of $24,000.

After the closing, the Dalys discovered that their 203K loan application was never

submitted by Jeff Meiser. Mr. Meiser submitted the application shortly thereafter. In March, 1993, the Dalys received a letter from Atlantic Coast Mortgage, Inc. (ACM), the institution which was to provide the 203K loan, and two truth-in-lending disclosure statements. The disclosure statements indicated that two loan applications had been submitted for the principal amounts of $149,860.16 and $147,585.77, respectively. The Dalys were shocked by the amount of the loans because Auricchio had consistently stated that the loan amount would only be $88,500 which consisted of the $24,000 mortgage to Henry Zulferino and the $64,500 needed to rehabilitate the property.

The Dalys then met with Jeff Meiser to discuss the 203K loan. At this meeting, the Dalys received a copy of their 203K loan application for the first time. The application indicated that the total cost to repair the South 20th Street property was estimated at $131,554 by Bruce Bannon of A.C.E. Construction and Urban Renewal, Inc. This amount exceeded the $64,500 that Auricchio represented at the seminar and in the "qualifying sheet" by $67,054.00.

By April 1993 the Dalys had become very concerned about their investments. They had not received any of the grant money that Auricchio had indicated was already allocated to the South 20th Street property, and the rehabilitation costs were much higher than Auricchio had stated. The Dalys tried to contact Auricchio on numerous occasions to discuss the matters, but he simply ignored their letters and calls. The Dalys then contacted an attorney to secure the return of their investment in the 453 South 18th Street property. In addition, the Dalys took it upon themselves to try to secure grant money to rehabilitate the South 20th Street property. However, they were informed by the City of Newark and the Department of Housing and Urban Development that the property was not eligible for any program because the property was not in a targeted area and no funds had been allocated.

On April 28, 1993 Auricchio personally contacted the Dalys for the first time since the closing, and only after receiving correspondence from the Dalys' attorney. Auricchio reassured the Dalys that they would receive a return on their investment in the South 18th Street property. With respect to the South 20th Street property, Auricchio represented that he would reimburse the Dalys for one half of their expenses associated with maintaining the property including the taxes and insurance, and that he would secure a moratorium on the mortgage payments to Henry Zulferino which were about to come due. In addition, Auricchio assured the Dalys that he would be able to get grant money for 690 South 20th Street and that Henry Zulferino, who had become associated with Auricchio, had the grant "lined up." Finally, Auricchio agreed to meet the Dalys to discuss the rehabilitation estimates. At the meeting, the Dalys provided Auricchio with all the documents regarding the 203K loan. Auricchio stated that he was appalled by the contractor's estimate and claimed that he could get the rehabilitation done more cheaply. Mr. Daly requested that Auricchio provide him with two additional estimates, which Auricchio agreed to furnish.

Auricchio thereafter provided the Dalys with one verbal estimate of the construction costs. Moreover, he never reimbursed the Dalys for his share of the maintenance expenses on the South 20th Street property. Auricchio did, however, convince Henry Zulferino to grant the Dalys a moratorium on the mortgage payments.

On or about June 10, 1993, the Dalys received additional correspondence from ACM indicating that although the estimated rehabilitation costs of 690 South 20th Street were $132,054, the after-improved value of the property was only $95,000. ACM advised the Dalys that they would only be entitled to receive a mortgage of approximately $80,750, which represented 85% of the anticipated improved value of the property. Moreover, ACM informed the Dalys that the mortgage to Henry Zulferino would also have to be paid off prior to closing on the loan. Accordingly, the Dalys would be left with only $64,000 of the 203K loan in which to rehabilitate the property. This amount was less than half of the estimated cost to rehabilitate the property.

After receiving the information from ACM, the Dalys immediately contacted Auricchio for advice on how to proceed. Auricchio never responded to the Dalys' request. The Dalys then received another letter from ACM advising them that if ACM did not hear from the Dalys by July 23, 1993, their application would be denied. Again, the Dalys attempted to contact Auricchio, but he failed to respond. Thereafter, on or about July 22, 1993, ACM notified the Dalys that their loan application had been denied. As a consequence, the Dalys were left with a burnt-out property, with no 203K loan, no prospects of receiving grant money, and with estimated rehabilitation costs greatly in excess of what had been represented by Auricchio.

With respect to the 453 South 18th Street investment, at the time the Dalys decided to purchase the property Auricchio had represented that the $11,200 would be the total outlay necessary to purchase the property. However, when the Dalys applied for a mortgage on the property they were told that they would have to pay an application fee of $500. Therefore, on or about June 13, 1993 the Dalys decided not to go through with the purchase of that property and requested the return of their deposit monies of $11,200. The money was returned to the Dalys shortly thereafter.

On August 18, 1994, the Dalys filed a civil action in state court against Auricchio, Auricchio Enterprises, East Coast Properties, Inc. and Henry Zulferino alleging fraud, breach of the partnership agreement, and violations of the federal and New Jersey civil RICO statutes. In preparation for their civil action, the Dalys discovered additional information regarding the relationship between Auricchio and Henry Zulferino which led to the filing of an amended complaint by the Dalys. The information the Dalys uncovered disclosed that Auricchio was the president, director and incorporator of a company named Venture Capital Corp. Prior to selling the 690 South 20th Street property to the Dalys, Henry Zulferino executed a mortgage in favor of Venture Capital Corp. in the amount of $50,000. Auricchio failed to inform the Dalys that he had an interest in the 690 South 20th Street Property prior to the sale to the Dalys.

After the civil suit was filed, Auricchio filed a petition for relief under chapter 11 of the Bankruptcy Code on September 29, 1994. The bankruptcy petition by Auricchio precipitated the filing of the nondischargeability complaint by the Dalys which is the subject of this opinion. The complaint alleged that Auricchio should be denied a discharge under Code sections 523(a)(2), 523(a)(4) and 523(a)(6). A trial was held in November 1995.

At the conclusion of the trial, the court made several rulings. Initially, the court addressed the South 18th Street property and found that although Auricchio breached his agreement with the Dalys, the plaintiffs failed to meet their burden of proof regarding nondischargeability under Code sections 523(a)(2), 523(a)(4) and 523(a)(6). Therefore, the Dalys are only entitled to an unsecured claim in the bankruptcy case against Auricchio's estate. The court reserved decision, however, as to the amount of the unsecured claim.

After considering the South 18th Street property, this court turned to the claims regarding the South 20th Street property. The court first addressed the allegations under Code section 523(a)(2)(A) for fraud and noted that the following elements must be met: the debtor must have made a misrepresentation of fact, which he knew to be false when made, which was made with the intention of deceiving the plaintiffs, on which they relied to their detriment, and which caused them damages. The court determined that Auricchio misrepresented that grant money would be available and that it already had been "lined-up" when in fact he knew there was no money available. In addition, Auricchio misrepresented the total construction cost necessary to rehabilitate the property and he knew that his statement as to construction costs was false when he made it. The court also noted that Auricchio's failure to inform the Dalys that he had an ownership interest in the property was a material misrepresentation because it may have influenced the Dalys' decision to purchase the property. The court concluded that Auric-

chio intended the Dalys to be deceived by these representations, and that they were in fact deceived, to their detriment. The court therefore held that the Dalys met their burden of proving by a preponderance of the evidence a cause of action under Bankruptcy Code section 523(a)(2)(A).

Next, the court analyzed the plaintiffs' claims under Code sections 523(a)(4) and 523(a)(6) with respect to the South 20th Street property. The court found that Code section 523(a)(4) requires proof of a fiduciary capacity which must exist pursuant to either an express or technical trust. The court noted that the fiduciary capacity may not arise under an implied or constructive trust or pursuant to a trust *ex maleficio*. *In the Matter of Angelle*, 610 F.2d 1335, 1338 (5th Cir.1980). The court concluded that the plaintiffs failed to establish a cause of action under 523(a)(4) because they failed to prove that either an express or technical trust existed.

The court also determined that the plaintiffs failed to establish a claim under Code section 523(a)(6) because they failed to prove willful or malicious injury. The court relied on *In re Conte*, 33 F.3d 303 (3d Cir.1994), which held that

> [a]n injury is willful and malicious under the Code only if the actor purposefully inflicted the injury or acted with substantial certainty that injury would result.

*Id.* at 305. The court concluded that the plaintiffs failed to meet their burden of proof that Auricchio purposefully injured the Dalys or acted with substantial certainty that injury would result to them.

The only issues remaining are the amount of damages suffered by the plaintiffs under Code section 523(a)(2)(A) with respect to 690 South 20th Street, and the amount of damages incurred by the plaintiffs for Auricchio's breach of contract with respect to 453 South 18th Street. The Dalys contend that they are entitled to receive the following damages with respect to the 690 South 20th Street property: a return of their downpayment of $9,000; all of the property taxes and insurance costs paid; miscellaneous maintenance costs, fees and fines associated with purchasing and maintaining the premises; and lost profits of $18,263.97. With respect to the 453 South 18th Street property, the Dalys allege that they are entitled to the attorneys fees paid to secure a return of their deposit paid and anticipated lost profits of $7,084. In addition, the Dalys claim that they are entitled to receive prejudgment interest from August 18, 1994, treble damages pursuant to N.J.S.A. 2C:41-4(a)(10), (c) and attorneys fees, costs and disbursements. For the reasons which follow, the court concludes that the Dalys are entitled to damages in the amount of $15,301.50 together with pre-judgment interest in the amount of $1,096.27 on the section 523(a)(2)(A) claim and $7,084.00 for the breach of contract.

## CONCLUSIONS OF LAW

The first issue that will be addressed is the amount that will be excepted from discharge under Code section 523(a)(2)(A). The plaintiffs contend that they are entitled to a return of their deposit, lost profits, and all of the costs and expenses related to maintaining the property. Code section 523(a)(2)(A) provides that a debtor will not be granted a discharge:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . .

11 U.S.C. § 523(a)(2)(A).

### A) Benefit to Someone Other Than Debtor under Code Section 523(a)(2)

■ The initial concern that must be considered is whether Code section 523(a)(2)(A) will permit a party to recover damages when the property obtained by the false representations was received by someone other than the debtor. In this case, the Dalys did not purchase 690 South 20th Street from Auricchio; they purchased it from Henry Zulferino. Therefore, the money received on account of Auricchio's false representations was obtained by Zulferino, not the debtor.

This issue has not been settled under bankruptcy law. Some courts have held that it is not necessary that the property be received by the debtor for Code section 523(a)(2) to apply. *In re Ashley,* 903 F.2d 599, 604 n. 4 (9th Cir.1990); *In re Carroll,* 16 B.R. 494 (D.Minn.1982); *In re Mann,* 40 B.R. 496, 499 (Bankr.D.Mass.1984); *In re Winfree,* 34 B.R. 879, 882–83 (Bankr. M.D.Tenn.1983). Other courts, however, have determined that in order for the exception to discharge to apply the property must be received by the debtor. *See In re Rippey,* 21 B.R. 954 (Bankr.N.D.Tex.1982) (finding that "§ 17a(2) exception to discharge of a debt is inapplicable where the bankrupt obtained no property for himself ..."). According to one commentator, however, "[t]he better view seems to be that it is not necessary that the property be actually procured for the debtor" for section 523(a)(2)(A) to apply. 3 *Collier on Bankruptcy* ¶ 523.08, at 523–51 (15 ed. 1994). If this approach is adopted, Auricchio is liable for the property received by Henry Zulferino.

■ Even if some benefit to the debtor is necessary, however, the debt in this case is still nondischargeable. "Any benefit to the debtor is sufficient for a finding that the debtor obtained property within the meaning of § 523(a)(2)(A)." *In re Spicer,* 155 B.R. 795 (Bankr.D.D.C.1993), *aff'd,* 57 F.3d 1152 (D.C.Cir.1995). An example of the type of benefit necessary to the debtor for purposes of section 523(a)(2)(A) was explored in *Ashley, supra.* In *Ashley,* the plaintiffs alleged that the loans it advanced to a third party were nondischargeable against the debtor because of the debtor's misrepresentations. The debtor argued that the plaintiffs' claim was dischargeable because he did not receive the fraudulently obtained funds himself. The court found that the debtor received some benefit under the circumstances because he arranged several loans on behalf of the third party in an effort to gain a foothold in the industry. *Ashley,* 903 F.2d at 604. Accordingly, the court held that the debtor was in a position to benefit from any capital infusion into the enterprise. *Id.*

Similar to the debtor in *Ashley,* the debtor in this case also received a benefit from his fraudulent representation. Henry Zulferino executed a mortgage in favor of Venture Capital Corp., which was owned by Auricchio, prior to the sale of the property to the Dalys. Accordingly, Auricchio had an interest in 690 South 20th Street prior to the sale and, therefore, received some benefit from his fraudulent misrepresentation. Moreover, he stood to benefit from his partnership agreement with the Dalys if they had somehow been able to rehabilitate the property.

### B) Measure of Damages under Code Section 523(a)(2)

■ The next issue that must be addressed is whether the Dalys are entitled to lost profits. The Dalys claimed that if the deal had proceeded as represented they would be entitled to $18,263.97, which is the Dalys' fifty percent share of Auricchio's monthly net profit projections of $1,178 for the period from April 1993 to October 1995.

The determination of whether to permit the plaintiffs to recover lost profits is contingent upon whether the "out of pocket rule" or the "benefit of the bargain rule" is applied. If the "benefit of the bargain" rule is accepted, the plaintiffs would be entitled to their projected lost profits, assuming that they are reasonably ascertained. Conversely, if the "out of pocket rule" is applied, the plaintiffs' recovery will be limited to the amount of money actually expended as a result of the fraud.

Courts are split on the question whether the "benefit of the bargain" or "out of pocket rule" should be applied in section 523(a)(2) cases. *In re Anguiano,* 99 B.R. 436 (9th Cir. BAP 1989) (out of pocket rule applied); *Chase Manhattan Bank v. Birkland,* 98 B.R. 35 (W.D.Wash.1988) (applying benefit of the bargain rule); *In re Bonnifield,* 154 B.R. 743 (Bankr.N.D.Cal.1993) (out of pocket rule applied); *In re Freeman,* 142 B.R. 758 (Bankr. E.D.Va.1991) (out of pocket rule applied); *In re Adelman,* 90 B.R. 1012 (Bankr.D.S.D. 1988) (benefit of the bargain rule applied); *In re Fasulo,* 25 B.R. 583 (Bankr.D.Conn. 1982) (benefit of the bargain rule applied); *In re Wilson,* 12 B.R. 363 (Bankr.M.D.Tenn. 1981) (benefit of the bargain rule applied). In *Wilson,* the debtor's ninety credit card purchases thirty days before she filed her

petition for relief were held nondischargeable under section 523(a)(2)(A). The creditor argued that the measure of relief should be the retail value of the goods purchased plus sales taxes and finance charges. Initially, the court recognized that it was the court's function "to fashion a remedy best suited to the harm." The court then analyzed the differences between the "out of pocket" and "benefit of the bargain" rules. The court noted that federal courts generally apply the "out of pocket rule" in cases involving fraud because it is easy to apply in that it limits injury to the actual loss sustained. *Wilson*, 12 B.R. at 366. The court determined, however, that the rule is flawed in that it

> 'does not discourage fraud, since the fraudulent party takes no chance of losing anything because of his fraud: if he is not called to account, he enjoys his plunder; if he is called to account, he merely gives back what was not rightfully his, and thus is no worse for the fraud. It has been said in this respect that if active fraud is to carry no greater penalty than to make price and value agree, honesty will not be much encouraged.'

*Id.* (quoting 37 Am.Jur.2d *Fraud and Deceit* § 356 (1968) (citations omitted)).

The *Wilson* court then turned to the "benefit of the bargain rule" and found that the "'rule compels the party guilty of fraud to make good his representations, and under its operation the parties are placed in the same position as if the contract and representations had been fully performed.'" *Id.* (quoting 37 Am.Jur.2d *Fraud and Deceit* § 353 (1968) (citations omitted)). The court asserted that the virtue of this rule is that it prevents a party from committing fraud without the possibility of loss. *Id.* (citations omitted). However, the court deemed that the principal disadvantage of the rule was the difficulty of proving, and the sometimes speculative nature of, the damages. *Id.* Nonetheless, the court concluded that the "benefit of the bargain rule" discourages fraud and should be applied in nondischargeability actions under section 523(a)(2)(A) because dishonest debtors should not reap the benefits of the Bankruptcy Code's fresh start policy. *Id.* at 370. The fresh start policy,

the court concluded, should only apply to the honest debtor. *Id.*

The Ninth Circuit Bankruptcy Appellate Panel has appeared to reach a middle ground with respect to this issue. *In re Anguiano, supra.* In *Anguiano,* the debtor guaranteed the lease payments for 200 water purification machines. After the debtor's company defaulted on the lease payments, the debtor filed for bankruptcy. The creditor filed an action under section 523(a)(2) seeking to except from discharge the full value of the unrecovered 33 machines and the full value of the lease payments. The creditor argued that the "benefit of the bargain rule" should be applied because of its policy of discouraging fraud. The court noted, however, that this policy consideration does not necessitate the use of the "benefit of the bargain rule" in all cases involving nondischargeability actions. The court distinguished the *Wilson* case, determining that there was no evidence that the debtor actually benefited from the lease agreement and that the creditor in the case before the court recovered most of the subject merchandise. *Anguiano,* 99 B.R. at 438. The court chose to apply the "out of pocket rule" and agreed with the bankruptcy court's determination to award the creditor the total cost for the 33 unrecovered machines. In making this determination, the court reasoned that if it allowed the creditor to recover the full lease payments and permit them to retain the 167 machines, the creditor would have received more than it would had the lease been fully performed. *Id.* Moreover, the court posited that there was no indication whether the creditor tried to mitigate its damages by re-leasing the 167 machines. *Id.*

While the Bankruptcy Appellate Panel applied the "out of pocket rule" in the *Anguiano* decision, it left open the question whether it would apply the "benefit of the bargain" rule in other nondischargeability actions.

There is a third line of cases which apply the "out of pocket rule" based on the plain language of section 523(a)(2). For example, the Bankruptcy Court for the Eastern District of Virginia has held that the language of section 523(a)(2) limits the damages recoverable to the actual loss suffered by the credi-

tor. *In re Freeman,* 142 B.R. 758 (Bankr. E.D.Va.1991). In that case, the creditors argued that the debt owed them should be deemed nondischargeable under section 523(a)(2) and that they should be entitled to receive the benefit of their bargain with the debtor under a contract executed between the parties. The contract was for the purchase of a condominium unit by the debtor, the terms of which provided that the debtor would be permitted to occupy the unit until December 30, 1986 at a rate of $22.50 per day. However, the contract also provided that if the closing did not occur the debtor would forfeit her purchase deposit and rent would accrue at $100 per day for any occupancy on or after January 1, 1987. The closing did not occur on December 30, 1986 and the debtor remained in the premises until October 9, 1987. The plaintiffs argued that they should be entitled to the total rent due under the contract. The court determined that the measure of damages under section 523(a)(2) is the amount actually lost by the creditor, "not what the creditor expected to receive under the contract." *Id.* at 761. The court reasoned that the language of § 523(a)(2) limits the scope of nondischargeability to the actual pecuniary loss. *Id.* at 761–62 (citations omitted). The court noted that some courts apply the "benefit of the bargain rule" to nondischargeability actions on the ground that it discourages fraudulent activity. *Id.* at 762 (citations omitted). However, the court determined that "the policy justification for these holdings is too open ended to be compelling and is preempted by the express limitation found in § 523(a)(2)." *Id.* *See also In re Casagrande,* 143 B.R. 893, 899 (Bankr.W.D.Mo.1992) (noting that "the plain language of section 523(a)(2) limits [the creditor's] damages to the money actually obtained by debtor by virtue of the alleged ... fraud.").

After reviewing the foregoing cases, this court believes that the analysis by the court in *Freeman* is the most persuasive. Section 523(a)(2) was amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 to provide relief to a creditor to the extent of the damage obtained by the debtor's fraud. As amended, the language of section 523(a)(2) limits the amount of damages a creditor may receive to "that which the debtor obtains through use of fraud ... not everything that the creditor may have suffered." *In re King,* 135 B.R. 734, 736–37 (Bankr.W.D.N.Y.1992). *See also In re McDonald,* 177 B.R. 212, 218 n. 5 (Bankr. E.D.Pa.1994).

Moreover, the concerns that the application of the "out of pocket rule" will not discourage fraud are misplaced. Admittedly, the "benefit of the bargain rule" would, in most instances, provide a creditor with greater relief and therefore have a hypothetically greater likelihood of discouraging fraud. However, the application of the "out of pocket rule" will also discourage fraud. Code section 523(a)(2) discourages fraud under either rule by requiring a debtor to pay an otherwise dischargeable debt as a result of his or her fraud. The fraudulent debtor risks losing the benefit of discharge and will be called to account for his plunder. As a consequence, even if the debtor merely gives back what is not rightfully his or hers, he or she will be worse off because the debt will survive the bankruptcy proceeding, and the dishonest debtor will not be able to reap the benefits of the Bankruptcy Code's fresh start policy as to such debt.

By applying the "out of pocket rule" to the present case, the Dalys are not entitled to lost profits. Rather, they are entitled only to their actual pecuniary loss. The Dalys claim that they paid for the following items:

| | | |
|---|---|---:|
| 1) | Downpayment for purchase of 690 South 20th Street | $ 9,000.00 |
| 2) | Finder's Fee paid to Glen Ledig | 2,000.00 |
| 3) | Total Property Insurance Paid | 1,826.50 |
| 4) | Property Taxes Paid | 1,600.00 |
| 5) | Fines to City of Newark | 175.00 |
| 6) | Travel Expenses | 300.00 |
| 7) | Boarding Up Costs | 400.00 |
| | Total | $15,301.50 |

The Dalys did not claim the amount due on their mortgage to Henry Zulferino as part of their damages, or prove the amount thereof. The mortgage amount is therefore not part of their damages.

■ The debtor asserted in his closing argument and trial brief that the value of the 690 South 20th Street property should be subtracted from the Dalys' damages. The debtor did not plead that as an affirmative

defense, however, and he offered no proof as to the value of the property. Although it is of course true that the plaintiff bears the burden of proving the amount of damages, the burden of proof is on the defendant as to most affirmative defenses. 29 Am.Jur.2d *Evidence* § 160 (1994). The burden was on the debtor to plead and prove the value of the property by way of setoff or other reduction of the Dalys' damages, and he failed to meet that burden.

■ In addition to their out of pocket costs, the Dalys will also be entitled to pre-judgment interest. The U.S. Court of Appeals for the Third Circuit has held that postpetition prejudgment interest may be awarded in nondischargeability actions under Code section 523(a). *Leeper v. Pennsylvania Higher Educ. Assistance Agency,* 49 F.3d 98, 101–02 (3d Cir.1995). *See also In re Levitsky,* 137 B.R. 288 (Bankr.E.D.Wis.1992); *In re Brace,* 131 B.R. 612 (Bankr.W.D.Mich. 1991). *Leeper* only addressed the entitlement to postpetition interest, because the debt in question was based upon a note, which accrues interest at the contract rate until the petition is filed, but ordinarily not thereafter under Code section 502(b)(2). *Leeper,* 49 F.3d at 101. Because the action in *Leeper* was based upon a note, *Leeper* does not address the rate for postpetition, prejudgment interest, because the court undoubtedly presumed that the postpetition interest would also accrue at the contract rate. Where, however, as here, the nondischargeability action is not based upon a debt with a contractual rate of interest, the courts apply a statutory rate in actions under Code section 523(a)(2). There is a split, however, in whether the federal or state statutory rate applies. Some courts have applied the state statutory rate of interest. *See Levitsky,* 137 B.R. at 292 (applying Wisconsin statutory rate); *In re Samford,* 39 B.R. 428, 432 (Bankr.M.D.Tenn.1984) (applying Tennessee statutory rate). On the other hand, the court in *Brace,* which was cited with approval in *Leeper,* applied federal law. In *Brace,* the court determined that 28 U.S.C. § 1961, which governs the rate and accrual of interest post-judgment, should apply to actions under § 523(a)(2) because a nondischargeability claim is purely a matter of federal law.

*Id.* at 614. The court found that it was both proper and expedient to apply the post-judgment rate established by 28 U.S.C. § 1961 to pre-judgment interest. *Id.*

Based on the reasoning by the court in *Brace,* this court finds that the rate established by 28 U.S.C. § 1961 should be applied to determine pre-judgment interest in this case. 28 U.S.C. § 1961 establishes the federal rate as follows:

> interest shall be calculated ... at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty two week United States Treasury Bills settled immediately prior to the date of the judgment.

The current federal rate of interest is 5.16%. Thus, the Dalys are entitled to pre-judgment interest from the date they filed their civil action in state court in the amount of $1,096.27.

■ It should be noted that the Dalys also claim that they are entitled to attorneys fees in the amount of $337.00 in connection with purchasing 690 South 20th Street. However, it has been held that creditors are either not entitled to attorneys fees under Code section 523(a)(2), or may only be entitled to them pursuant to either a contractual basis or statutory authority. *See e.g. TranSouth Financial Corp. of Fla. v. Johnson,* 931 F.2d 1505 (11th Cir.1991) (attorneys fees may be awarded pursuant to contract or statutory authority); *In re Martin,* 761 F.2d 1163 (6th Cir.1985) (same); *See also In re McDonald,* 177 B.R. 212, 218–19 (Bankr.E.D.Pa.1994) (plain language of § 523(a)(2) precludes finding that creditor is entitled to attorneys fee); *In re King,* 135 B.R. 734 (Bankr.W.D.N.Y. 1992) (creditors not entitled to attorneys fees under the plain language of section 523(a)(2)). The Dalys are not entitled to attorneys' fees under either approach.

### C) Punitive Damages

■ The Dalys also claim that they should be entitled to treble damages pursuant to New Jersey's RICO statute, N.J.S.A. 2C:41–4(a)(10)(c). Courts are split on the issue of whether punitive damages may be excepted

from discharge under § 523(a)(2). Most courts have found that punitive damages awards are dischargeable under § 523(a)(2). *In re Levy*, 951 F.2d 196, 198–99 (9th Cir. 1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *In re Ellwanger*, 105 B.R. 551, 555 (9th Cir. BAP 1989); *In re Sciscoe*, 164 B.R. 86, 89 (S.D.Ind.1993); *In re Day*, 137 B.R. 335, 341–42 (Bankr. W.D.Mo.1992); *In re Larson*, 79 B.R. 462, 465 (Bankr.W.D.Mo.1987); *In re Suter*, 59 B.R. 944, 947 (Bankr.N.D.Ill.1986). Other courts disagree and hold that punitive damages for fraud are excepted from discharge by § 523(a)(2). *In re St. Laurent*, 991 F.2d 672 (11th Cir.1993); *In re Manley*, 135 B.R. 137, 144–45 (Bankr.N.D.Okla.1992); *In re Tobman*, 96 B.R. 429 (Bankr.S.D.N.Y.1989); *rev'd on other grounds*, 107 B.R. 20 (S.D.N.Y.1989); *In re Guy*, 101 B.R. 961 (Bankr.N.D.Ind.1988).

In *Levy*, the court held that the language of § 523(a)(2) and the structure established in section 523 as a whole supports a conclusion that section 523(a)(2), unlike sections 523(a)(4) and 523(a)(6), does not bar discharge of punitive damages. *Levy*, 951 F.2d at 198. In contrast to the court's decision in *Levy*, the Eleventh Circuit in *St. Laurent* held that punitive damages for fraud are excepted from discharge by § 523(a)(2)(A). *St. Laurent*, 991 F.2d at 680.

Recently, Judge Gambardella addressed whether punitive damages for fraud, such as treble damages under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–19, can be excepted from discharge by section 523(a)(2)(A). *In re Cohen*, 185 B.R. 180 (Bankr.D.N.J.1995). Judge Gambardella agreed with the position espoused by the Eleventh Circuit in *St. Laurent, supra*, reasoning that the broad definition of the term "debt" under the Bankruptcy Code included treble damages specified by the Consumer Fraud Act. *Id.* at 188.

After analyzing the conflicting authorities, this court finds the position of the Ninth Circuit in *Levy* is more persuasive. Although the Bankruptcy Code provides an expansive definition of the term "debt," the language of section 523(a)(2), unlike sections 523(a)(4) and 523(a)(6), places a cap on the amount of "debt" that may be excepted from discharge. Under general principles of statutory construction, courts are to attempt to give meaning to all statutory language and to avoid determinations which render any statutory language a nullity. *Astoria Federal Savings & Loan Assoc. v. Solimino*, 501 U.S. 104, 112, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991); *Gustafson v. Alloyd Company*, ——— U.S. ———, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955). Courts should, therefore, construe the clause "to the extent obtained" in section 523(a)(2) as adding some meaning to the term "debt."

This approach is consistent with the application of the "out of pocket rule" to section 523(a)(2) causes of action. Moreover, the Dalys have not met their burden of proof with respect to treble damages under N.J.S.A. 2C:41–4(a)(10)(c). Accordingly, punitive damages shall not be awarded.

### D) Breach of Contract Damages

The next issue that must be addressed is the amount of the unsecured claim the Dalys will receive with respect to the purchase of the 453 South 18th Street property. The court has already decided that Auricchio breached his contract with respect to that property. The Dalys claim that they are entitled to fees paid to their attorney to secure the return of their downpayment, in addition to projected lost profits of $7,084, representing the Dalys' projected share of such profits for the eight months in which Auricchio held the downpayment monies.

In a suit for breach of contract, the proper measure of damages is that which is necessary to place the injured party in a position it would have attained had the contract been performed as promised. *Agathos v. Starlite Motel*, 977 F.2d 1500, 1510 (3d Cir.1992). In determining the proper amount of damages three issues must be addressed: "(1) the nature of the benefit contracted for, (2) whether the defendant failed to deliver what was, in fact, bargained for, and (3) whether there is sufficient proof of the amount of damages." *In the Matter of Van Dyk Research Corp.*, 13 B.R. 487, 498

(Bankr.D.N.J.1981) (citing *Giumarra v. Harrington Heights, Inc.,* 33 N.J.Super. 178, 109 A.2d 695 (N.J.App.Div.1954), *aff'd* 18 N.J. 548, 114 A.2d 720 (1955)). The court has already determined that an agreement existed in which Auricchio promised to consummate the sale of 453 South 18th Street and that Auricchio breached that promise. Therefore, the only issue that needs to be addressed is whether there is sufficient proof of the amount of damages.

■■■■ It is well settled under New Jersey law that once the plaintiff has established the fact of injury, it only has to prove the amount of damages with reasonable certainty. *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1176 (3d Cir.1993) (citing *Tessmar v. Grosner,* 23 N.J. 193, 128 A.2d 467, 472 (1957)). Moreover, New Jersey no longer adheres to the "new business rule" which, as embodied in several older New Jersey cases, provided that lost profits of a new business are too remote and speculative to permit an award of damages. *Id.* (citations omitted). Therefore, lost profits may be awarded in this case if the amount has been established with reasonable certainty.

■■■ Lost profits may be estimated from the facts in evidence, "including the inferences to be drawn from them and the probabilities they suggest." *Universal Computers Ltd. v. Datamedia Corp.,* 653 F.Supp. 518, 527 (D.N.J.1987), *aff'd,* 838 F.2d 1208 (3d Cir.1988) (quoting *Gardener v. The Calvert,* 253 F.2d 395, 399–400 (3d Cir.), *cert. denied,* 356 U.S. 960, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958)). In the present case, the evidence offered by the plaintiffs was an itemized list of damages which provided that the Dalys share of lost income on the 453 South 18th Street property was $7,084. This estimate was derived from Auricchio's own projections of the income the property would generate on a monthly basis. Since Auricchio had projected the income from the property and did not refute the Dalys calculations, the Dalys have established the amount of lost profits with reasonable certainty.

### CONCLUSION

Based on the foregoing, the Dalys are entitled to judgment against Auricchio under Code section 523(a)(2)(A) in the amount of $15,301.50, together with pre-judgment interest in the amount of $1,096.27, for a total of $16,397.77 in connection with their purchase of the South 20th Street property. In addition, the Dalys are entitled to an unsecured claim against the estate of $7,084.00 for the lost profits on the South 18th Street property. The attorney for the plaintiff shall submit two orders: one to be entered in the main bankruptcy case allowing the Dalys an unsecured claim against Auricchio's bankruptcy estate in the aggregate amount of the two claims adjudicated herein, and the other as a judgment to be entered in this adversary proceeding, with its caption, against Auricchio under Code § 523(a)(2)(A) for $16,397.77. The attorney for the plaintiffs is to file and serve the orders within fifteen days under D.N.J.Bankr.Ct.R. 4(c).